JOHN K. JOHNSEN AND FRANCES JOHNSEN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12592–80. · Filed July 24, 1984.

*Donald W. Geerhart* and *Donald J. Forman*, for the petitioners.

*Sara M. Coe*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined a deficiency of $3,700 in the petitioners' Federal income tax for 1976. After a concession by the petitioner, the issues remaining for decision are: (1) Whether a limited partnership formed to develop an apartment project was carrying on a trade or business as of December 31, 1976; (2) if the limited partnership was not carrying on a trade or business during 1976, whether the petitioner may deduct under section 212(1) or (2) of the Internal Revenue Code of 1954[1] his share of loan commitment fees and management and guarantee fees incurred by the limited partnership in 1976; (3) whether the petitioner may deduct under section 212(3) his share of the legal fees and consulting and advisory fees that the limited partnership incurred in 1976; and (4) whether the petitioner's distributive share of the limited partnership's expense items should be adjusted to reflect the fact that the petitioner was not a member of the partnership during its entire 1976 taxable year.

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, John K. and Frances Johnsen, are husband and wife who maintained their legal residence in West Bloomfield, MI, at the time they filed their petition. For their 1976 taxable year, they filed a joint Federal income tax return with the Internal Revenue Service Center, Cincinnati, OH. Mr. Johnsen will sometimes be referred to as the petitioner.

In 1969, Charles W. Greener and Alan R. Sumner formed the architectural firm of Greener & Sumner Architects, Inc., and during 1976, they owned between 80 and 85 percent of the stock of such corporation. Since the early 1970's, Mr. Greener and Mr. Sumner engaged in the development of real property located in the South and Southwest. They conducted their development activities through a general partnership, which was their primary development company, as well as through the architectural corporation, a construction corporation, and Centre Property Management (CPM), which managed the projects in which they were involved.

Mr. Greener and Mr. Sumner were involved in the development of the Centre Square project, consisting of two apartment projects and a tennis club, located on contiguous parcels of land in Richardson, TX. The plan for the entire complex was conceived in 1972, but the complex was built in stages. The tennis club was constructed first, and the Centre Square I apartment project was completed next in late 1974 or early 1975. Construction of Centre Square III, the second project, was deliberately delayed to avoid overbuilding the market.

On April 11, 1976, Mr. Greener, Mr. Sumner, Robert S. Spencer, Ralph P. Lebkuecher, Ralph E. Noble, and W.W. Harlan formed Centre Square III (the general partnership). The partnership agreement was subsequently amended, retroactive to April 11, 1976, by eliminating Mr. Noble and Mr. Harlan as general partners. Centre Square III, Ltd. (the limited partnership), was also formed on April 11, 1976. The limited partnership utilized the accrual method of accounting. The general partners of the limited partnership were Norman L. Nelson, Jr., Greener & Sumner Architects, Inc., and Equity Advisors, Inc. During 1976, Mr. Lebkuecher and Mr. Spencer each owned 50 percent of the stock of Equity Advisors, Inc.

The original limited partner of the limited partnership was Dee W. Dilts, who was Mr. Nelson's law partner.

The parties to the limited partnership agreement intended Mr. Dilts to be a nominee who would have no interest in Centre Square III and who would withdraw when the new limited partners were admitted. By an amended limited partnership agreement, effective September 9, 1976, Mr. Dilts withdrew as original limited partner and was replaced by 22 other limited partners (counting each husband and wife couple as one limited partner) including the petitioner, each of whom had executed the amended limited partnership agreement between May and September 1976.

The original limited partnership agreement provided that the limited partners would have a 99-percent interest in the capital and profits of the limited partnership through December 31, 1980; thereafter, the limited and the general partners would each have a 50-percent interest in the limited partnership's capital and profits. The limited partnership agreement also provided that from April 11, 1976, through December 31, 1980, the general partners would guarantee a cash flow sufficient to provide a breakeven operation on a cash flow basis; i.e., the general partners agreed to pay any cash flow deficits in the event the partnership failed to break even. The "no negative cash flow" guarantee was customary in the syndication of similar projects, and the guarantee made limited partnership interests much more marketable.

On April 11, 1976, the general partnership agreed to sell its entire interest in the Centre Square III apartment project, including the land, plans, specifications, and any contracts concerning the project to the limited partnership, for $3,171,200. On the same day, the limited partnership executed a written management agreement with the general partnership. Under the terms of the agreement, the general partnership assumed total responsibility for the leasing, management, and administration of Centre Square III. The general partnership was responsible for the selection, training, supervision, and scheduling of the work of all the necessary personnel and consultants. The agreement provided that the general partnership could utilize others to discharge its duties, although it remained ultimately responsible for performance. The general partnership was also obligated to make all reasonable efforts

to promptly lease all the units in Centre Square III. The management agreement specified that as soon after the commencement of construction as was practicable, the general partnership would begin an aggressive campaign of advertising and promotion so that units would be rented as they were completed. Such agreement specified that the general partnership would bear the costs of the campaign. The general partnership again guaranteed that Centre Square III would operate without cash flow deficits through December 31, 1980. Finally, the management agreement provided that the general partnership would receive management and guarantee fees of 5 percent of the gross receipts generated by Centre Square III and an additional $50,000 each year for 1976 through 1980. During 1976, there were no gross receipts, and the percentage fee yielded no payment. In that year, the fixed fee was primarily intended to compensate the general partnership for management activities; after 1976, the percentage fee was allocable to management activities, and the fixed fee was allocable to the cash flow guarantee.

On April 13 and April 26, 1976, Mr. Greener personally acquired title to the land upon which Centre Square III was to be built by four separate warranty deeds. The approximate cost of all the land was $455,000; the purchase price was financed by a loan in the amount of $450,000 from the Mercantile National Bank. On September 9, 1976, Mr. Greener executed a deed conveying the land to the general partnership for $450,000, and such deed was filed for recording the next day. On September 10, 1976, the general partnership executed a deed conveying the Centre Square III land to the limited partnership, but such deed was not recorded.

Sometime between August 5, 1976, and September 9, 1976, the general partnership secured a commitment from Wells Fargo Realty Advisors Inc. (Wells Fargo) for a construction loan in an amount not to exceed $2,820,000. On September 9, 1976, the general partnership paid a commitment fee to Wells Fargo of $28,200. Pursuant to the commitment, Wells Fargo and the general partnership entered into a building loan agreement on September 9, 1976, and the partnership issued a promissory note for $2,820,000 to Wells Fargo signed by the six partners. The general partners individually guaranteed the note because Wells Fargo required the individual guarantees

as a condition of its commitment. The general partnership applied $450,000 of the construction loan proceeds to its purchase of the Centre Square III land from Mr. Greener.

On April 7, 1976, the First Texas Savings Association of Dallas (First Texas) issued its permanent loan commitment to the general partnership in the amount of $2,820,000. The general partnership initially paid First Texas $28,200 in nonrefundable commitment fees; in August 1976, First Texas extended the commitment until August 31, 1977, for which extension the general partnership paid an additional $11,280. The general partnership paid a refundable fee of $56,400, which was repaid on October 19, 1977, at the closing of the permanent loan, and it also paid a brokerage fee of $56,400 to Martin Morgan & Co.

The commitment provided that the permanent loan would be payable over 30 years subject to the lender's option to require payment in full after 15, 20, or 25 years. The commitment provided for an interest rate of 9¾ percent. The commitment also imposed upon the borrower full recourse liability for repayment until Centre Square III was fully rented at the rents specified in the commitment. After such time, the borrower would only be personally liable for that portion of the outstanding loan balance which exceeded $2,115,000 or 75 percent of the original loan balance of $2,820,000.

By letters dated April 20, 1976, August 17, 1976, and July 19, 1977, First Texas extended and modified its commitment. Pursuant to the modifications, First Texas agreed to permit the general partnership to transfer to the limited partnership beneficial title to the realty securing the permanent mortgage loan. Additionally, the general partnership was required to submit to First Texas an appraisal by an appraiser approved by First Texas showing that the loan amount was no greater than 75 percent of the value of the security. In August 1976, First Texas received and approved an appraisal which valued Centre Square III at $3,767,500.

The permanent loan closing occurred on October 19, 1977. On that date, the general partnership executed a first mortgage note, a deed of trust, and an assignment of rentals in favor of First Texas. The note provided for partial recourse liability on the part of the makers and was secured by the deed

of trust and the assignment of rentals from Centre Square III. The partners of the general partnership signed the note both individually and as partners.

The general partnership provided construction and permanent financing to the limited partnership. The construction loan commitment letter, issued on April 15, 1976, provided that the general partnership would make a construction loan in the amount of $3,171,200. The limited partnership agreed to pay a nonrefundable commitment fee of $28,200. The limited partnership executed a nonrecourse construction loan note on September 10, 1976. The note was secured by a deed of trust executed on the same date. Both the note and the deed of trust were expressly subordinate to the first mortgage lien held by Wells Fargo in the amount of $2,820,000.

On April 14, 1976, the general partnership issued to the limited partnership its commitment to provide the permanent financing for Centre Square III. The commitment provided for a 30-year loan in the amount of $3,171,200 at an annual interest rate of 9¾ percent. The commitment recited a fee of $84,600, which it stated was 2¾ percent of the original loan,[2] and provided that the loan was to be nonrecourse. In August 1976, the general partnership extended its commitment until August 31, 1977, for which extension the limited partnership paid a fee of $11,280.

On October 19, 1977, the limited partnership executed a nonrecourse promissory note and a deed of trust which reflected the terms of the permanent loan commitment. Both the note and the deed of trust were subordinate to the first mortgage lien held by First Texas.

Prior to the formation of the limited partnership, the property upon which it was to build Centre Square III was zoned for shopping centers. Mr. Greener and his associates secured the unanimous approval of the Richardson zoning commission that the property be rezoned to permit residential development. However, shortly after the formation of the limited partnership, neighborhood opposition to the proposed rezoning arose which caused the city council to reject the zoning application. Mr. Greener and his associates spent many weeks in meetings with homeowners and institutions in the

---

[2]The $84,600 is 2¾ percent of $3,076,363.64; $84,600 is exactly 3 percent of $2,820,000, the amount of the permanent loan which the general partnership obtained from First Texas.

vicinity of Centre Square III and ultimately persuaded them to drop their opposition to the rezoning. In September 1976, the city council approved the rezoning.

The start of construction was delayed for 4 months while the rezoning was sought, and additional construction delays were attributable to unusually severe winter weather. Construction of Centre Square III began in September 1976 and was finally completed in October 1977. Each stage of the construction was inspected by Richardson authorities as it was completed; their approval of each stage was necessary before construction of the next stage could proceed. As a practical matter, it was common for Richardson area apartment developers to allow tenants to move in prior to the issuance of the certificate of occupancy. Mr. Greener had initially anticipated that the first tenant could move in during September or October of 1976; however, because of the delays, the first tenant did not move in until June 1, 1977. By September 20, 1977, Centre Square III was fully occupied. On October 7, 1977, the city of Richardson issued a certificate of occupancy for the Centre Square III apartments.

During the time that Centre Square III was under construction, Mr. Greener's offices were located one and a half blocks away from the site. He lived in Centre Square I, which was separated from the construction site by the tennis club. Mr. Greener and John Beardsley personally directed the activities of CPM, which had assumed some of the general partnership's obligations under the management agreement. CPM employed Brenda Garcia, who was the resident, or on-site, manager for Centre Square I. Ms. Garcia also handled preleasing activities for Centre Square III during 1976 and 1977. She had an office at Centre Square I, and she also lived there.

During the construction period in 1976 and 1977, Mr. Greener and CPM were engaged in preparing Centre Square III for occupancy. An important part of their activities consisted of finding tenants to lease the 136 apartments which would be available at Centre Square III.

While Centre Square III was being built, Ms. Garcia and CPM compiled lists of prospective tenants, whose names were obtained in several ways. If a prospective tenant arrived at Centre Square I, seeking an apartment there, and none was available, Ms. Garcia explained that similar apartments would

become available in Centre Square III. She showed prospective tenants completed apartments in Centre Square I, which were similar to those under construction, and she also took them to the tennis club and the construction site. Although the apartments were still under construction, tenants were able to determine their locations and views. At least two tenants who came to Centre Square I seeking apartments during 1976 ultimately rented apartments in Centre Square III. Ms. Garcia began soliciting tenants for Centre Square III in October 1976, and she also began keeping a list of the prospective tenants during 1976. In addition, prospective tenants were recruited through advertising at local companies and through the use of tenant locater services. Such services received a portion of the first month's rent paid by each tenant they provided, so CPM paid no locater fees during 1976. CPM also prepared a brochure describing Centre Square III. Finally, in November 1976, Greener & Sumner Architects, Inc., purchased two 4- by 8-foot signs that advertised the prospective availability and features of the Centre Square III apartments.

Although Mr. Greener and CPM were seeking prospective tenants for Centre Square III during 1976, they did not accept any rental deposits or advances during that year. Mr. Greener believed that rents were increasing, and he anticipated that rents set during 1977 when the tenants were ready to move in would exceed the rents which prevailed during 1976. Rental deposits on uncompleted units of Centre Square III were received from prospective tenants beginning in January 1977. The preleasing activities were very successful, and CPM was able to fill the apartments as they became available. The leases were for terms of not more than 1 year.

CPM engaged in other management activities during 1976 and 1977 while Centre Square III was under construction. Maintenance personnel were trained during this period so that they would be familiar with the construction of the apartments. CPM also trained managerial personnel. Finally, CPM began negotiating the necessary service contracts for garbage disposal, lawn care and landscaping, pool maintenance, and pest control. Effective pest control was necessary while the apartments were being built to prevent infestation during that time.

The law firm of Nelson & Dilts was counsel to the limited partnership. During 1976, the law firm prepared and reviewed partnership documents, filed documents with the secretary of state of Texas, and rendered a nontax legal opinion on behalf of the limited partnership. On January 1, 1977, Nelson & Dilts submitted a statement of account to the limited partnership; such statement recited that the firm charged $2,500 for "Legal organizational fee; preparation of partnership documents and rendering advice on related matters for 1976" and $7,500 for "Legal and tax advice and consultation re: tax aspects of partnership transaction and other related matters for 1976." The total amount of the legal fees was determined in April 1976, prior to the issuance of the offering memorandum.

The offering memorandum for the limited partnership, dated April 15, 1976, provided that the limited partners' 99-percent interest would be divided into 20 units of 4.95 percent.[3] The memorandum further provided that each unit would be sold for $47,000, payable in five equal installments of $9,400. The first installment was due upon the limited partner's admission; the remaining installments were due annually thereafter. The limited partnership units were sold by Mr. Lebkuecher and Mr. Spencer, through their investment consulting firm, Lebkuecher & Spencer, Inc. (LSI). During 1976, LSI usually received a sales commission of 8 to 10 percent of the price of each unit sold. Such commission was paid by the partnership LSI was syndicating.

LSI was able to sell the interests in the limited partnership easily by offering them to its existing clients, many of whom had invested in earlier portions of Centre Square development. The petitioner was not a prior client of LSI, but he learned of the availability of interests in the limited partnership and contacted LSI seeking to invest in one. On July 19, 1976, the petitioner executed the amended limited partnership agreement, which became effective on September 9, 1976, and drew a check for $9,400 in payment of his first installment.

In April 1976, prior to the issuance of the offering memorandum, the amount of the compensation that LSI would receive from the limited partnership was agreed to. In addition to selling the limited partnership interests, LSI was also involved

---

[3]The discrepancy between the number of interests and the number of partners is not explained.

in the formation of the limited partnership. At such time, Mr. Spencer was involved in discussions with Mr. Greener and the attorneys and accountants for the partnership concerning the transactions and possible structure to be utilized in the Centre Square III project and the tax ramifications of the various alternatives. Mr. Spencer also reviewed and commented upon the limited partnership agreement. On March 3, 1977, LSI issued a statement charging the limited partnership $25,000 for "Selling and Organizational Expense for 1976" and $37,500 for "Consulting and Tax Advisory Services for 1976."

Centre Square III proved to be a very successful investment for the limited partnership. The limited partnership never experienced a negative cash flow; it was able to make a cash distribution in 1977, its first year of operations; and it sold Centre Square III in 1980 at a substantial profit.

On its U.S. Partnership Return of Income for 1976, the limited partnership deducted $37,500 for "tax advisory fees," $7,500 for "legal fees," $50,000 for "management and guarantee fees," and $66,427 for "amortization of commitment fees." The limited partnership amortized the commitment fees over the duration of the commitments; the amount deducted was composed of $15,667 of the interim loan fee and $50,760 of the permanent loan fee. On the Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., that it issued to the petitioner, the limited partnership listed the petitioner's share of the partnership's ordinary loss for 1976 as $9,568.

In his notice of deficiency, the Commissioner disallowed the limited partnership's deductions for legal fees, tax advisory fees, commitment fees, management and guarantee fees, as well as for miscellaneous expenses. The Commissioner determined that the petitioner had failed to establish, among other things, that the limited partnership was carrying on a trade or business as of December 31, 1976, that the claimed expenses were ordinary and necessary within the meaning of section 162, that the expenditures were not capital in nature, that the deduction of the expenses was not precluded by section 709, and that the expenses did not represent nondeductible organizational or syndication expenses of the partnership. Accordingly, the Commissioner determined that the petitioner had overstated his distributive share of the limited partnership

loss. In the notice of deficiency, the Commissioner utilized 4.95 percent as the petitioner's interest in the limited partnership.

OPINION

The first issue for decision is whether the limited partnership was carrying on a trade or business as of December 31, 1976. The petitioner presents a two-pronged argument with respect to such issue. He first contends that the doctrine denying current deductions for what have come to be known as "preopening" expenses is unsound; he then asserts that the facts of the present case, when viewed in light of the proper legal criteria, clearly demonstrate that the limited partnership was carrying on a trade or business as of December 31, 1976. The Commissioner replies that our recent cases regarding preopening expenses were correctly decided and that the limited partnership was not carrying on a trade or business as of December 31, 1976.

Section 162(a) provides that a taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year "in carrying on any trade or business." The quoted phrase has been construed to deny current deductions for expenses incurred by a taxpayer prior to the time it commences actual business operations and performs those activities for which it was organized. *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); *Hoopengarner v. Commissioner*, 80 T.C. 538, 540 (1983), on appeal (9th Cir., Sept. 2, 1983); *Bennett Paper Corp. v. Commissioner*, 78 T.C. 458 (1982), affd. 699 F.2d 450, 452 (8th Cir. 1983); *Estate of Boyd v. Commissioner*, 76 T.C. 646 (1981); *Goodwin v. Commissioner*, 75 T.C. 424 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521 (1979), affd. 633 F. 2d 512 (7th Cir. 1980).

The facts of *Hoopengarner v. Commissioner, supra,* and *Goodwin v. Commissioner, supra,* are similar to those of the present case. *Hoopengarner* involved a taxpayer who, in 1976, acquired a long-term ground lease of a parcel of vacant land. The lease required him to construct and operate an office building on the land. During 1976, the taxpayer made rental payments under the ground lease and, as lessor of the building to be erected, entered into a lease agreement with a tenant.

The taxpayer received no rent during 1976. During 1977, the building was constructed, and two tenants took possession. The taxpayer asserted that the ground rents paid in 1976 were deductible pursuant to section 162. In rejecting such contention, we stated:

> While we have already found as a fact that the rental payments were ordinary and necessary, we cannot find as a fact, in the circumstances here present, that the petitioner made those payments "for the purposes of the trade or business" as required by section 162(a)(3). The acquisition of the leasehold interest and the securing of a tenant during 1976 were not events of sufficient magnitude to put petitioner in the office building rental trade or business. Simply put, his rental business had not started to function in the year before us and he was, in fact, in the act during that year of incurring what has been termed "preopening expenses." See *Richard Television Corp. v. United States,* * * *; *Bennett Paper Corp. v. Commissioner,* * * *; *Goodwin v. Commissioner,* * * *. Accordingly, we must sustain respondent's determination that section 162 does not permit the deduction of the expenses under consideration. [80 T.C. at 540; fn. ref. omitted.]

*Goodwin* involved taxpayers whose partnerships had secured financing and commenced the construction of apartment projects during 1972. In disallowing deductions under section 162 for the expenses incurred in obtaining the financing, we stated:

> We think it clear that neither * * * [partnership] was carrying on a trade or business during 1972, since the housing projects were not completed or occupied by tenants until some time after that year. [75 T.C. at 433; fn. ref. omitted.][4]

We decline the petitioner's invitation to reconsider our opinions in the cases discussed above. The petitioner argues that *Richmond Television* and the subsequent cases somehow misconstrued or misapplied earlier precedents involving expenses incurred before a firm commitment to enter a specific trade or business was made. We do not agree. Our decisions subsequent to *Richmond Television* represent the logical application of long-established principles. See *Todd v. Commissioner,* 77 T.C. 246 (1981), affd. per curiam 682 F.2d 207 (9th

---

[4]See also *Haskins v. Commissioner,* T.C. Memo. 1982–730, where we held that the taxpayers were not "carrying on" the business of operating a shopping center until the date the center opened and income was received, and *Francis v. Commissioner,* T.C. Memo. 1977–170, where we held that the taxpayer was not in the trade or business of operating an apartment complex until the complex was finally completed and producing income.

Cir. 1982); *Birdneck Realty Corp. v. Commissioner*, 25 B.T.A. 1084 (1932); *Harrisburg Hospital Inc. v. Commissioner*, 15 B.T.A. 1014 (1929). The issue presented in each such case was whether under section 172(d)(4) or its predecessors, expenses incurred prior to the commencement of actual business operations were "attributable to a taxpayer's trade or business" so as to be included in determining the amount of a net operating loss deduction. In each case, we determined that the expenses were preopening expenses which were thus not attributable to a trade or business. In *Todd*, we expressly adopted the preopening expense doctrine of section 162 to resolve the issue under section 172. 77 T.C. at 249–250.

The petitioner argues that other sections of the Internal Revenue Code, as well as of prior revenue acts, have contained language similar to that of section 162 and that the meaning of such other statutory language has been broadly construed. However, such other statutes involved issues unrelated to the issue in the present case, and their interpretation does not govern herein. For example, the Supreme Court has explicitly stated that different standards apply in determining what constitutes doing business for purposes of section 174 and corporate excise taxes than for purposes of section 162. *Snow v. Commissioner*, 416 U.S. 500, 502–503 (1974); *Higgins v. Commissioner*, 312 U.S. 212, 217 (1941). Additionally, Congress has recognized that section 162 precludes deduction of preopening expenses. In 1980, Congress enacted section 195 to provide taxpayers with relief from the preopening expense doctrine. Miscellaneous Revenue Act of 1980, Pub. L. 96–605, 94 Stat. (Part 3) 3521. Section 195 permits taxpayers to amortize "startup expenditures" over a period of not less than 60 months. Included within the statute's coverage are "investigatory" expenses as well as "startup or preopening expenses," which the Ways and Means Committee defined as:

costs which are incurred subsequent to a decision to acquire or establish a particular business and prior to its actual operation. Generally, the term "startup costs" refers to expenses which would be deductible currently if they were incurred after the commencement of the particular business operation to which they relate. * * *

Startup costs may include expenses relating to advertising, employee training, lining-up distributors, suppliers, or potential customers, and professional services in setting up books and records. * * * [H. Rept. 96–1278 (1980), 1980–2 C.B. 709, 712.]

Congress recognized that such costs "normally are not deductible currently since they are not incurred in carrying on a trade or business or while engaging in a profit-seeking activity." H. Rept. 96–1278, *supra*, 1980–2 C.B. at 711–712.

Finally, the petitioner asserts that the preopening expense doctrine is inconsistent with the Supreme Court's interpretation of section 162 in *Trust of Bingham v. Commissioner*, 325 U.S. 365 (1945). There, the Court, in construing the predecessor of section 212, stated that such section was in pari materia with section 162 authorizing the deduction of trade or business expenses. The Court stated, "Such expenses need not relate directly to the production of income for the business. It is enough that the expense, if 'ordinary and necessary,' is directly connected with or proximately results from the *conduct of the business.*" 325 U.S. at 373–374; emphasis added. Such language is not relevant to the resolution of the present case, because the issue herein is not whether there is a sufficient nexus between the expenses and the active conduct of a trade or business, but whether the taxpayer was conducting a trade or business. Accordingly, we conclude that the prior decisions of this Court set forth the appropriate criteria for the resolution of the present case.[5]

In 1976, the limited partnership obtained title to the land upon which Centre Square III was to be built. During the same year, the limited partnership obtained interim financing and a permanent loan commitment from the general partnership, and it executed a management agreement with the general partnership. Construction of Centre Square III began in September of 1976. Although it is clear from the record that CPM undertook its management responsibilities while the construction was proceeding, the extent of its management activities during 1976 is not entirely clear. However, during 1976, CPM did begin to compile lists of prospective tenants, to exhibit the construction site and examples of the apartments

---

[5]To the extent *Blitzer v. United States*, 231 Ct. Cl. 236, 684 F.2d 874 (1982), is inconsistent with the position of this Court, we decline to follow *Blitzer*. See *Haskins v. Commissioner*, T.C. Memo. 1982–730, 45 T.C.M. 359, at 362, 51 P-H Memo T.C. par. 82,730, at 82–3165. The petitioner also relies upon *Snyder v. United States*, 674 F.2d 1359 (10th Cir. 1982), where the court rejected the Government's contention that an author could not be in the trade or business of writing until he had published his first book. In our view, such case is not inconsistent with the position of this Court as set forth in *Wright v. Commissioner*, 31 T.C. 1264, 1267–1268 (1959), affd. per curiam 274 F.2d 883 (6th Cir. 1960).

to prospective tenants, to train future maintenance personnel, and to negotiate for service contracts. No rental deposits were accepted during 1976, and no tenants occupied apartments in Centre Square III until June of 1977. There is no evidence that any tenant leases were executed during 1976.

We view *Goodwin v. Commissioner, supra,* and *Hoopengarner v. Commissioner, supra,* as dispositive of this issue. Although the limited partnership had begun to prepare for the operation of the apartment project during 1976, its activities during that year did not constitute the operation of a rental apartment project. Centre Square III was not completed or occupied by tenants until 1977, and no rental deposits were accepted until that year. Accordingly, we have concluded that the limited partnership was not carrying on a trade or business on December 31, 1976. No deduction pursuant to section 162 is permitted with respect to partnership expenses incurred during 1976.

The second issue for decision is whether the petitioner may deduct under section 212(1) or (2) his share of the loan commitment fees and management and guarantee fees incurred by the limited partnership in 1976. The petitioner argues that the limited partnership incurred such expenses with the ultimate objective of producing income from Centre Square III or for the management, conservation, or maintenance of property held for the production of income. He relies upon our recent decision in *Hoopengarner v. Commissioner, supra,* where we held that the taxpayer could deduct the 1976 rental payments under the ground lease pursuant to section 212(2). We concluded that the preopening expense doctrine, concerning expenses incurred prior to the commencement of a trade or business, did not apply to section 212 since such section has no trade or business requirement. 80 T.C. at 543. We found that the taxpayer acquired the lease with the sole objective of generating recurring income in the near future and that his interest in the lease satisfied the requirement of section 212 that the taxpayer have a proprietary or possessory interest in the income-producing property. See *Frank v. Commissioner,* 20 T.C. 511, 514 (1953). We also found that the rent paid in 1976 was not a capital expenditure because it did not produce any equity that survived more than a year after the payment.

The Commissioner presents several contentions in response to the petitioner's arguments under section 212. First, he asserts that *Hoopengarner* was incorrectly decided and should be overruled. At the time such case was before the Court, we thoroughly considered arguments similar to those advanced by the Commissioner in the present case. We do not believe that our position should be changed. Moreover, we do not believe that the nature of the expenses in *Hoopengarner* serves to distinguish it from the present case. The Commissioner has presented no ground for the application of a different rule for commitment, management, and guarantee fees than for ground rent, and we can discern none. Accordingly, we conclude that *Hoopengarner* is equally applicable to the type of expenses at issue in this case, and we adhere to our position therein.

The Commissioner's next argument regarding section 212 was presented for the first time in his brief. The Commissioner asserts that the petitioner is not entitled to any deductions under section 212 because, at the time the limited partnership incurred the commitment fees and the management and guarantee fees, it had no proprietary or possessory interest in any income-producing property. Hence, the Commissioner concludes, no deduction under section 212 is permitted. See *Weinstein v. United States*, 190 Ct. Cl. 437, 420 F.2d 700 (1970). However, the petitioner contends that such argument constitutes a new theory raised for the first time on brief and that our consideration of it at this time would unfairly prejudice him. See *Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975); *Theatre Concessions, Inc. v. Commissioner*, 29 T.C. 754, 760–761 (1958).

Although the Commissioner did not rely upon section 212 in determining the limited partnership's income in the notice of deficiency,[6] the question of whether the petitioner was entitled to deduct his allocable share of the commitment fees and the management and guarantee fees pursuant to section 212 was raised by the petition. In his answer, the Commissioner denied that the petitioner was entitled to the deduction, but he did

---

[6] A partnership is not allowed the deduction under sec. 212 in computing its taxable income. Sec. 703(a)(2)(E). However, the Commissioner agrees with the petitioner that a partnership can incur expenses that the partners can deduct under sec. 212. See sec. 1.702–1(a)(8)(i), Income Tax Regs.; Rev. Rul. 75–523, 1975–2 C.B. 257.

not state his theory regarding such issue until approximately 1 month prior to the trial of this case. In response to an interrogatory propounded by the petitioner, the Commissioner stated that the expenses were not deductible under section 212 because such expenses were not properly accruable until after December 31, 1976, the expenses were not incurred for the production of income, and the expenses were capital in nature. In his trial memorandum, the Commissioner argued that the limited partnership did not hold the Centre Square III property for the production of income; instead, such property was held for use and was, in fact, used in a trade or business in a subsequent year. The Commissioner also argued that the petitioner had the burden of proving that the expenses were ordinary and necessary and not capital. Finally, in her opening statement, the Commissioner's counsel framed the issues with respect to section 212 as follows:

> We contend that Petitioners cannot transform expenses incurred in the organization and start-up of the trade or business into deductible expenditures by using the label expenses for the production of income.
> Petitioners claim that the expenses were for management, conservation or maintenance of property falls flat on its face when met with the fact that the property was only 10%—only 10% of the construction was complete by the end of 1976.

From the foregoing, it is clear that prior to and during the trial, the Commissioner had not argued that the section 212 deductions were disallowed because the limited partnership incurred the commitment, management, and guarantee fees in April 1976 at which time it had no proprietary or possessory interest in the Centre Square III property.[7]

The Commissioner contends that his "theory" as framed by the pleadings "is that the deduction does not qualify under section 212." The Commissioner apparently believes that once section 212 was in issue, he was free to raise any issue under such section at any time regardless of prejudice to the petitioner. We do not agree. This Court has refused to consider new theories raised by the Commissioner for the first time in his brief where our consideration of such theories would prejudice the petitioner, even where the Commissioner's new

---

[7]We observe that the Commissioner's position in his brief contradicts his pretrial position that the expenses in issue were not accruable until after 1976.

theories arise under the same Code section as did the theories upon which the case was tried. *Aero Rental v. Commissioner,* 64 T.C. at 338; *Nash v. Commissioner,* 31 T.C. 569, 574 (1958); *Theatre Concessions, Inc. v. Commissioner,* 29 T.C. at 760–761; *Philbrick v. Commissioner,* 27 T.C. 346, 353 (1956); *Hettler v. Commissioner,* 16 T.C. 528 (1951); *O'Meara v. Commissioner,* 8 T.C. 622 (1947).

During the trial of the present case, the parties did not concentrate upon the precise dates during 1976 when the limited partnership incurred the commitment, management, and guarantee fees, or when it acquired a proprietary or possessory interest in the Centre Square III property because such questions were not directly relevant to the parties' contentions under section 212. As a result, the petitioner has had no opportunity to develop evidence to rebut the contentions made by the Commissioner in his brief, and the record is unclear regarding such contentions. We agree that our consideration of the argument which the Commissioner raised for the first time in his brief would prejudice the petitioner. Accordingly, we decline to consider such argument. We emphasize that we are expressing no opinion regarding our resolution of such issue had it been properly raised.

The Commissioner next contends that a portion of the permanent loan commitment fee was not ordinary and necessary because such fee was excessive and because a portion of it constituted a nondeductible broker's fee.[8] See *Duffy v. United States,* 231 Ct. Cl. 679, 690 F.2d 889, 895 (1982); *Longview Hilton Hotel Co. v. Commissioner,* 9 T.C. 180, 182 (1947).

To finance the amounts that it loaned to the limited partnership, the general partnership incurred a construction loan commitment fee of $28,200, a permanent loan commitment fee of $28,200, a permanent loan commitment extension fee of $11,280, and brokerage fees in connection with the permanent loan commitment of $56,400. The general partnership charged the limited partnership a construction loan commitment fee of $28,200 and a permanent loan commitment

---

[8]The Commissioner has agreed that, to the extent that the commitment fees are otherwise deductible under sec. 212, he will follow Rev. Rul. 56–136, 1956–1 C.B. 92, revoked prospectively only, Rev. Rul. 81–160, 1981–1 C.B. 312, and will not contend that the commitment fees are capital expenditures. See *Duffy v. United States,* 231 Ct. Cl. 679, 690 F.2d 889, 893–894 (1982); but see *Francis v. Commissioner,* T.C. Memo. 1977–170, where we held that a loan commitment fee is to be amortized over the period of the loan to which it relates.

fee of $95,880, including an extension fee of $11,280, but no amount as brokerage fees. The Commissioner does not contest the ordinary and necessary nature of the construction loan commitment fee charged to the limited partnership or the permanent loan commitment fee charged to the limited partnership to the extent of $39,480 (consisting of $28,200 plus the extension fee of $11,280), but he does contend that the rest of the so-called permanent loan commitment fee was excessive.

The regulations provide that, for an expense to be considered ordinary and necessary under section 212, the expense must be reasonable in amount. Sec. 1.212–1(d), Income Tax Regs.; *Trust of Bingham v. Commissioner*, 325 U.S. at 370. When the amounts of the commitment fees are determined by arm's-length negotiations between unrelated parties having adverse economic interests, we are more likely to accept both the reasonableness of the amounts paid and the taxpayer's characterization of such amounts. However, in the present case, the general partnership and the limited partnership were under common control, and the amount denominated as the limited partnership's permanent loan commitment fee ($95,880) equals the sum of the general partnership's commitment fee ($28,200), the extension fee ($11,280), and the brokerage fee ($56,400). The petitioner bears the burden of disproving the Commissioner's determination. Rule 142(a), Tax Court Rules of Practice and Procedure[9]; *Welch v. Helvering*, 290 U.S. 111 (1933). In light of the relationship between the general and limited partnerships, such burden will not be lightly discharged.

The petitioner contends that the permanent loan commitment which the general partnership made to the limited partnership was much more valuable than that which First Texas made to the general partnership. He asserts that, in order for the limited partnership to achieve the desired tax results, it was necessary that the loan to it be entirely nonrecourse. See sec. 1.752–1(e), Income Tax Regs. He maintains that it would have been extremely difficult for the limited partnership to obtain such a loan from an unrelated lender. While the First Texas commitment provided for full recourse liability until Centre Square III was fully rented and

---

[9]Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

while First Texas could call its loan after 15, 20, or 25 years, the commitment that the general partnership granted to the limited partnership was nonrecourse and had no call option. The petitioner concludes that the higher commitment fee charged to the limited partnership was intended to compensate the members of the general partnership for the added risks which they assumed.

The petitioner's arguments are based primarily upon Mr. Greener's testimony. He testified that nonrecourse loans without call options are generally more expensive to secure than recourse loans callable after a shorter time. He also testified generally that the fee charged to the limited partnership was comparable to the fees charged during 1976 for similar commitments both by unrelated lenders and by entities with which Mr. Greener was involved. While we accept Mr. Greener's testimony that tax and business considerations necessitated the financial structure adopted in the present case, we believe the most convincing evidence of the amount an unrelated lender would have charged for a similar commitment is the fee that First Texas charged the general partnership. There is simply no other specific evidence regarding the value of the commitment given by the general partnership, nor is there any evidence, other than Mr. Greener's general assertions, to demonstrate that the differences between the commitments justified the general partnership's charging a fee of more than twice what it paid.

Additionally, we are not convinced that the members of the general partnership were, by virtue of the differences between the loan commitments, placed at such greater financial risk as to justify the commitment fee charged by the general partnership. The First Texas loan was in an amount slightly less than 75 percent of the appraised value of Centre Square III. Absent a precipitous drop in local real estate values, it is unlikely that the property would prove insufficient security for the debt. Furthermore, at the time the permanent loan was executed on October 19, 1977, Centre Square III was completed and the apartments were fully occupied. It was apparent that the full recourse liability of the members of the general partnership was about to be sharply reduced pursuant to the terms of the First Texas loan. Finally, we are not convinced that the absence of the 15-year call option in the commitment made to

the limited partnership had any significant effect on the commitment's value. The usual practice of the developers with whom Mr. Greener was associated was to sell projects they developed within 5 years after construction, and such practice was followed in the present case. Clearly, the members of the general partnership anticipated that they would no longer be personally liable and that the limited partnership would no longer own Centre Square III at the time First Texas could first call its loan. In summary, we are not convinced that the differences between the commitment received by the general partnership and the commitment given to the limited partnership were substantial enough to justify more than doubling the charge.

Nor are we convinced by the petitioner's assertions that in April 1976 when the general partnership determined the fee that it would charge the limited partnership, the general partnership did not know the total broker's fees that it would ultimately pay regarding the First Texas commitment and thus that it did not set its commitment fee merely to recoup its total commitment and broker's fees. The petitioner argues that the general partnership intended to make a profit on the spread between the commitment fees but that such profit evaporated when the broker charged twice the anticipated fee regarding the First Texas commitment. We observe that the general partnership obtained the First Texas commitment on April 7, 1976, and that the commitment letter recited the commitment fee. One week later, the general partnership gave its commitment to the limited partnership, and the letter recited a fee of $84,600. There is absolutely no evidence concerning when the broker's fee was determined, and we cannot say that such fee was unknown to the general partnership when it set its commitment fee. Additionally, while the petitioner's assertions, if proved, would tend to rebut the Commissioner's argument that the general partnership set the commitment fee merely to pass along the broker's fees to the limited partnership, the petitioner's contentions would not rebut the Commissioner's argument that the amount of the fee was excessive, whatever motivated its determination. In any case, we are not persuaded by the petitioner's contentions.

For such reasons, we conclude that the petitioner has failed to sustain his burden of disproving the Commissioner's deter-

mination that only $39,480 of the permanent loan commitment fee of $95,880 incurred by the limited partnership during 1976 was ordinary and necessary.[10]

The Commissioner's final contention regarding section 212(1) or (2) is that the $50,000 management and guarantee fee incurred by the limited partnership during 1976 is not deductible because it is a capital expense. We think the Commissioner's argument is misguided. We have found as a fact that during 1976 the fee was primarily intended to compensate the general partnership for its management activities in that year and that the general partnership did in fact carry on substantial management activities for the limited partnership in that year. Section 212(2) provides for the deduction of ordinary and necessary expenses paid or incurred during the taxable year for the *management,* conservation, or maintenance of property held for the production of income. There can be no question but that the $50,000 fee was an expense incurred for the management of property held for the production of income.

The Commissioner would have us avoid the obvious construction of section 212. He contends that the management fee was designed primarily to compensate CPM for the leasing campaign that it conducted during late 1976 and during 1977 and that fees paid to brokers to obtain leases must be amortized over the periods of the leases. See *Renwick v. United States,* 87 F.2d 123 (7th Cir. 1936); *Meyran v. Commissioner,* 63 F.2d 986 (3d Cir. 1933), affg. a Memorandum Opinion of this Court; *Central Bank Block Assn. v. Commissioner,* 57 F.2d 5 (5th Cir. 1932), affg. 19 B.T.A. 1183 (1930). The Commissioner's argument is not compelling. CPM performed other services for the limited partnership, and the $50,000 fee is not wholly allocable to the leasing activities. Additionally, the leases involved in the present case were for periods of not more than 1 year and thus are not analogous to the long-term leases involved in the cases cited by the Commissioner. Accordingly, we conclude that the $50,000 fee is not a capital expenditure.

---

[10]The limited partnership incurred a permanent loan commitment fee of $95,880. On its 1976 return, the limited partnership deducted only $50,760 of the total amount, which it found to be the portion of the total fee attributable to the portion of the permanent loan commitment period which elapsed in 1976. Of this amount, we have determined that $56,400/$95,880 $\times$ $50,760, or $29,859, is *not* ordinary and necessary. Accordingly, the remainder of the amount claimed for 1976, $20,901, is ordinary and necessary.

In summary, we have concluded that the petitioner may deduct pursuant to section 212(1) or (2) his share of the construction loan commitment fee claimed by the limited partnership, a portion of the permanent loan commitment fee ($20,901), and all of the management fee claimed by the limited partnership for 1976. *Hoopengarner v. Commissioner, supra.*

The third issue for decision is whether the petitioner may deduct his share of the legal fees and consulting and advisory fees that the limited partnership incurred during 1976. The limited partnership deducted, as an expense for tax advice, $7,500 of the $10,000 paid to the law firm of Nelson & Dilts for services rendered in 1976. In his brief, the petitioner recognizes that he has failed to sustain his burden of proving that such allocation was correct; but he contends that *some* portion of the legal fees was deductible, and he requests that we apply the rule of *Cohan* to determine the deductible portion. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930); see *Merians v. Commissioner*, 60 T.C. 187 (1973).

Section 709(a) provides that no deduction shall be allowed to a partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership. Section 709(b) provides for the amortization of specified organization expenses if the partnership so elects.[11] The regulations pursuant to section 709 include within the definition of organization expenses "Legal fees for services incident to the organization of the partnership, such as negotiation and preparation of a partnership agreement." Sec. 1.709–2(a), Income Tax Regs. Such regulations further provide that syndication expenses, including "legal fees of the underwriter or placement agent and the issuer * * * for securities advice and for advice pertaining to the adequacy of tax disclosures in the prospectus or placement memorandum for securities law purposes," are not subject to the section 709(b) election and must be capitalized. Sec. 1.709–2(b), Income Tax Regs. The cost of obtaining a tax opinion letter that is included with the offering memorandum

---

[11]Sec. 709(a) applies to partnership taxable years beginning after Dec. 31, 1975. Sec. 709(b) applies to amounts paid or incurred in taxable years beginning after Dec. 31, 1976. Sec. 213(b), (f)(1), (3), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1547–1549. Thus, sec. 709(b) is not available to the limited partnership for 1976.

is not deductible since such fee is incurred to promote or facilitate the sale of the partnership interests advertised in the memorandum. Sec. 709(a); *Surloff v. Commissioner*, 81 T.C. 210, 245–246 (1983); *Flowers v. Commissioner*, 80 T.C. 914, 943 (1983).

The evidence regarding the services performed by Nelson & Dilts is extremely sketchy. The statement that the lawyers submitted to the limited partnership did not include an itemization of the services performed and the time spent on each activity. No member of the firm testified at the trial. The petitioner did produce 183 pages of documents relating to work performed by the law firm, and such documents indicate that the vast majority of the firm's services concerned the organization of the limited partnership. Additionally, Mr. Spencer testified that the lawyers may have prepared the tax opinion letter and that they participated in discussions at which the tax consequences of alternative business proposals were considered.

For this Court to make a *Cohan* estimate, we must be convinced from the record that the limited partnership incurred expenses for *deductible* tax advice in at least the amount allowed in such estimate; absent that assurance, "relief to the taxpayer would be unguided largesse." *Williams v. Commissioner*, 245 F.2d 559, 560 (5th Cir. 1957); *Luman v. Commissioner*, 79 T.C. 846 (1982); *Epp v. Commissioner*, 78 T.C. 801 (1982); compare *Merians v. Commissioner*, 60 T.C. at 190.

In the present case, we cannot be certain what portion of the legal fees was attributable to tax advice rather than general organizational advice. Moreover, the evidence indicates that such tax advice as may have been given consisted primarily of the preparation of the tax opinion letter; such an expense is a nondeductible promotion or sales expense. *Surloff v. Commissioner*, *supra*. Since we are not convinced that a deduction pursuant to section 212(3) in any amount is proper, we conclude that the petitioner may not deduct his share of the legal fees incurred by the limited partnership during 1976. See *Wendland v. Commissioner*, 79 T.C. 355, 389 (1982).

The limited partnership also claimed as a deduction for "tax advisory fees" $37,500 of the $62,500 paid to LSI for services rendered in 1976. In the statement submitted to the limited partnership, LSI allocated 40 percent of its fees, or $25,000, to

selling and organizational expenses, and 60 percent to tax advice. The petitioner contends that such allocation was proper and that the amount allocable to tax advice is deductible. He has the burden of proving his contentions. Rule 142 (a); *Welch v. Helvering*, 290 U.S. 111 (1933).

LSI did not itemize the services that it performed or the time that it spent on each activity, nor was its tax advice manifested in any work product submitted to us, and again, the petitioner bases his argument on the testimony of Mr. Spencer. Mr. Spencer testified that the allocation of the fee between selling and organizational services and tax advice was based upon the time spent on each activity and upon negotiations among LSI, Mr. Greener, and Mr. Nelson. Mr. Spencer also testified that he was present at numerous discussions at which the tax considerations of various business alternatives were considered. He stated that although he was consulted on several issues, he did not interpret the tax laws; instead, he gave advice regarding business alternatives in light of the requirements of the tax law as explained by other tax professionals.

Our analysis regarding the deductibility of the legal fees is equally applicable to the consulting fee. The meager record before us is totally insufficient to sustain the allocation for which the petitioner contends. We observe that neither the amount of the fee nor its allocation resulted from arm's-length bargaining between unrelated parties with adverse economic interests. Mr. Spencer's presence at meetings at which tax considerations were discussed does not prove that tax consultation constituted any significant portion of the services rendered by LSI. On the contrary, it is clear from the record that LSI was primarily responsible for promoting and selling the limited partnership interests to its clients. Mr. Spencer testified that he and Mr. Lebkuecher each received a one-quarter interest in the general partnership as compensation for their selling efforts, but such testimony is insufficient to establish that the amount paid to them for 1976 was not additional compensation for their expertise and services in organizing and promoting the limited partnership.

From this record, we are unable to conclude that an allocation of any amount to tax advice is proper. Moreover, we are not convinced that any amount so allocated would be

deductible. See *Surloff v. Commissioner*, 81 T.C. at 245–246. Where the petitioner totally fails to prove what portion, if any, of the alleged tax advisory fees is deductible, we have disallowed a deduction for any portion of such fees. Sec. 709 (a); *Flowers v. Commissioner*, 80 T.C. at 943; *Wendland v. Commissioner*, 79 T.C. at 389. Accordingly, we conclude that the petitioner may not deduct his share of the "tax advisory fee" paid to LSI by the limited partnership for 1976.

The fourth issue for decision is whether the petitioner's distributive share of the limited partnership's deductions should be adjusted to reflect the fact that the petitioner was not a member of the limited partnership during the entire 1976 taxable year. In his notice of deficiency, the Commissioner did not challenge the petitioner's claim that his interest in the limited partnership was 4.95 percent. In his answer, the Commissioner alleged that the deficiency was "further based on petitioners' failure to prove the proper allocation of any loss to the period of time during which petitioners held an interest" in the limited partnership. At the trial, the petitioner maintained that the retroactive allocation of loss issue had not been properly pleaded and was not before the Court. The petitioner's counsel admitted that he had known at least 2 months prior to the trial that the Commissioner would raise such issue. This Court ruled that the Commissioner's answer sufficed to raise the retroactive allocation of loss issue, and we permitted the introduction of evidence regarding it. After the trial, the Commissioner amended his answer to allege specifically that the limited partnership was formed on April 11, 1976, that the petitioner obtained his 4.95-percent interest on July 19, 1976, that in reporting his 1976 share of the partnership loss, the petitioner claimed 4.95 percent of the limited partnership's 1976 loss, and that the petitioner failed to take into account his varying interest in the limited partnership during 1976.

We adhere to our trial ruling in the face of the petitioner's renewed objection that the retroactive allocation of loss issue was not before the Court and that the trial of such issue prejudiced the petitioner. The Commissioner's answer sufficed to raise the issue, and the petitioner was aware well before the trial that the Commissioner intended to try the issue. The retroactive allocation of loss issue is properly before us; but

since the issue was not included in the notice of deficiency, the burden of proof regarding it is upon the Commissioner. Rule 142(a).

Section 702(a) requires a partner to report his distributive share of the partnership's items of income, gain, loss, deduction or credit, or other taxable income or loss. With certain exceptions, section 704(a) provides that a partner's distributive share is to be determined by the partnership agreement. However, section 706(c)(2) provides certain tax consequences to a partner whose partnership interest changes during the partnership's taxable year. Section 706(c)(2)(B) provides that a partner "whose interest is reduced (whether by entry of a new partner, partial liquidation of a partner's interest, gift, or otherwise)" shall determine his distributive share of partnership items "by taking into account his varying interests in the partnership during the taxable year." It is now well established that such section also requires a new partner who enters the partnership during its taxable year to determine his distributive share of partnership loss by taking into account his varying interests in the partnership during the taxable year. *Hawkins v. Commissioner*, 713 F.2d 347 (8th Cir. 1983), affg. a Memorandum Opinion of this Court; *Richardson v. Commissioner*, 693 F.2d 1189 (5th cir. 1982), affg. 76 T.C. 512 (1981); *Snell v. United States*, 680 F.2d 545 (8th Cir. 1982); *Williams v. United States*, 680 F.2d 382 (5th Cir. 1982); *Lipke v. Commissioner*, 81 T.C. 689 (1983); *Roccaforte v. Commissioner*, 77 T.C. 263 (1981), revd. on another issue 708 F.2d 986 (5th Cir. 1983).

In the present case, the limited partnership was formed on April 11, 1976. On July 19, 1976, the petitioner executed the amended limited partnership agreement and made the initial payment for his limited partnership interest. The amended limited partnership agreement became effective on September 9, 1976, and the petitioner and 21 other limited partners replaced Mr. Dilts, who was the original limited partner. The petitioner contends that the varying interest rule of section 706(c)(2)(B) is applicable to a new partner only when the interest of an existing partner is reduced by the entry of the new partner. The petitioner argues that his entry into the limited partnership did not reduce the interest of any existing partner. He asserts that the general partners' interest in the

partnership capital and profits was 1 percent at all times during 1976 under the terms of both the original and the amended limited partnership agreements. The petitioner further asserts that Mr. Dilts was a nominee limited partner who never had an interest in the limited partnership, so that the petitioner's entry into the limited partnership could not have reduced any interest of Mr. Dilts therein.

The petitioner is seeking to reap the benefit of mutually inconsistent positions, and we cannot accept his argument. If Mr. Dilts was a true nominee or dummy limited partner, then the only partners prior to September 9, 1976, were the general partners, and their interests were reduced by the entry of the limited partners, including the petitioner. Under such analysis, the original limited partnership agreement, specifying that the general partners had only a 1-percent interest in the capital and profits of the partnership, is irrelevant. Since the general partners were the *only* partners, there was no one else to share in the partnership profits or losses. When the limited partners joined the partnership, the general partners were no longer the *only* partners; accordingly, the interests of the general partners were reduced at such time. On the other hand, if Mr. Dilts was more than a mere nominee, then his interest in the limited partnership was reduced, from 99 percent to 0 percent, by the entry of the new limited partners. In either event, the present case falls squarely within the varying interest rule. Sec. 706(c)(2)(B); see S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 133–136. In conclusion, we hold that the petitioner must determine his distributive share of the limited partnership deductions by taking into account his varying interest during the partnership's 1976 taxable year.[12]

*Decision will be entered under Rule 155.*

---

[12]The question of how the petitioner's varying interest must be accounted for is not before us, and accordingly, we do not decide it. In his brief, the Commissioner indicated that any reasonable method of allocating the partnership's deductions to the portion of the partnership's 1976 taxable year during which the petitioner was a partner would suffice. He also indicated that if proration were the method adopted, he would consider the petitioner as having been a member of the limited partnership from July 19, 1976, in computing the petitioner's share of the partnership loss.