CHARLES R. HEFTI AND MARION HEFTI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hefti v. Commissioner
Docket No. 21306-84.
United States Tax Court
T.C. Memo 1988-22; 1988 Tax Ct. Memo LEXIS 25; 54 T.C.M. (CCH) 1555; T.C.M. (RIA) 88022; January 20, 1988; As amended January 21, 1988 The court upheld the commissioner's determination of a deficiency and additions to tax.
Charles R. Hefti and Marion Hefti, pro se. [1]
James A. Kutten, for the respondent. *28 GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION [2]
GERBER, Judge: Respondent, by a notice of deficiency dated March 30, 1984, determined income tax deficiencies and additions to tax in petitioners' 1980, 1981 and 1982 taxable years, as follows: Income Tax
Additions to the Tax
Year
Deficiencies
Sec. 6653(a)(1) [3]
Sec. 6653(a)(2)
1980
$ 29,077.15
$ 1,453.86
Not applicable
1981
26,510.83
1,325.54
*
1982
22,686.95
1,134.34
** *29 In the notice of deficiency, respondent determined numerous adjustments to the amounts reported by petitioners, none of which have been fully agreed to resolved prior to trial. [4] We are presented with the following general categories of issues for our consideration: (1) Whether petitioners' reported income should be increased each year in issue by the amount respondent determined based upon use of an indirect analysis (cash expenditures method); (2) whether various types of deductions connected with the use of petitioners' residence for business purposes are deductible; (3) whether petitioners have met the requirements of section 274 in substantiating their travel and entertainment expenses; (4) whether petitioners have shown that they are entitled to an amount in excess of the amounts allowed by respondent for business use of automobiles; (5) with respect to rental property: (a) whether furnishings acquired are deductible in the year of purchase or must be capitalized, and (b) whether petitioners are entitled to a full year's depreciation where property was placed in service for less than a full year; (6) whether petitioners are entitled to various expenses claimed under various *30 classifications including cost of goods sold; (7) whether either or both petitioners are liable for self-employment tax during the years in question; and (8) whether petitioners are liable for additions to tax under section 6653(a) for 1980 and section 6653(a)(1) and (2) for 1981 and 1982. General Background
The parties have entered *31 into stipulations of facts along with attached exhibits all of which are incorporated by this reference. Petitioners Charles R. Hefti and Marion Hefti are husband and wife, and resided at St. Louis, Missouri, at the time they filed their petition in this proceeding. Petitioners operated an audio-visual business known as "Creative Sound," as sole proprietors, at their family residence, located at 4 Rolling Rock Lane, St. Louis, Missouri. Petitioners' business is to create, edit and duplicate audio and visual material for clients. The business serves the needs of commercial, educational and industrial users. Mr. Hefti has more than 20-years experience in announcing, engineering, editing and designing audio and video materials. He has worked on radio and television and has been involved in commercials, educational materials and industrial productions. Mrs. Hefti assists in some technical aspects of the business and is primarily responsible for recordkeeping. Petitiones are industrious, work long hours and have established a successful enterprise operating out of their home. Adjustments to Gross Income Based on Cash Expenditures Method
Petitioners utilized one checking *32 account, under the name "Creative Sound," for both business and personal purposes and deposited business receipts into that checking account. The gross receipts shown on petitioners' returns were the total of the deposits into the checking account. Petitioners, during the audit of their 1980, 1981 and 1982 taxable years, did not provide specific records reflecting the source of their reported gross receipts. Kevin McGrath, respondent's revenue agent, utilized an indirect method involving expenditures to determine whether petitioners' reported gross receipts reconciled with their expenditures. Subsequent to issuance of the notice of deficiency and the institution of this case, petitioners supplied respondent with records reflecting their invoices or billings for the years in issue. The totals of the billing records submitted were $ 9,546.44, $ 29,218.87 and $ 6,354.69 less than the amounts of gross receipts reflected on petitioners' 1980, 1981 and 1982 joint Federal income tax returns, respectively. Petitioners did not have any reliable or accurate records of specific receipts for the taxable years in question. Agent McGrath interviewed Mr. Hefti during the audit process. Based *33 upon the interview, Agent McGrath determined that petitioners had: $ 1,000 or less of cash on hand as of December 31, 1979; no investments; no outstanding loans; and no nontaxable sources of income. Petitioners responded "not available" to respondent's pretrial interrogatories inquiring into the amount of cash on hand and nontaxable sources of cash. Based upon these assumptions, Agent McGrath analyzed petitioners expenditure records and determined the amount of cash expenditures for each year, which did not include any amounts paid for by check or credit card. Agent McGrath performed a cash expenditures analysis by examining each cash expenditure, excluding expenditures paid by check, charge and cash expenditures traced to specific cash withdrawals, sources of cash and any other cash available to determine whether petitioners may have had any unreported income. Petitioners' savings account and loan receipts were analyzed and withdrawals from savings and loan proceeds, which were identified, were not included in the cash expenditures analysis. Mr. Hefti provided Agent McGrath with the annual amounts of mileage for his motor vehicles, which amounts were multiplied times the standard *34 mileage rate to produce a reconstructed cash expenditure for automobile operation. Agent McGrath also located specific items purchased for cash and unreported amounts of business income and interest which were added to the other cash expenditures. Then Agent McGrath determined the sources of cash and reduced the cash expenditures by amounts of cash from reported and nontaxable sources. Based upon this method of indirect reconstruction, respondent determined, in the notice of deficiency, that petitioners' gross receipts were understated in the following amounts: 1980 -- $ 4,924.21, 1981 -- $ 8,277.73 and 1982 -- $ 9,903.14. At trial and on brief respondent adjusted downward the amounts of proposed understatements, computing the reduced amounts as follows: 1980
Cash expenditures based upon amounts reflected
in petitioners' tax return
$ 8,223.61 Automobile expenses-14,338 x $ .09
1,290.42 Purchase of automobile for cash
3,925.00 Customer receipt not deposited in checking account [5]
276.00 Unreported interest income - savings account
159.88 Sources of cash [6]
(4,400.00)
Interest from a certificate of deposit
(2,100.35)
Interest from a certificate of deposit
(2,100.35)
Other cash available
(1,500.00)
Total proposed understatement
$ 3,774.21 1981
Cash expenditures based upon amounts reflected
in petitioners' tax return
$ 9,639.00 Automobile expenses-14,097 x $ .09
1,268.73 Sources of cash
(5,480.65)
Total proposed understatement
$ 5,427.08 1982
Cash expenditures based upon amounts reflected
in petitioners' tax return
$ 13,847.91 Automobile expenses-12,847 x $ .09
1,156.23 Cash to purchase condominium
4,600.00 Sources of cash
(11,602.91)
Total proposed understatement
$ 8,001.23 *35 Petitioners, in their reply brief submitted their schedules of cash expenditures and sources, but they did not eliminate those cash expenditures which were traceable to a reported or nontaxable source. Under petitioners' schedules and to their own detriment, they arrived at cash expenditures of $ 35,289.25 and $ 54,762.14 for 1980 and 1982. For 1981, petitioners arrived at cash expenditures of $ 8,483.64. Petitioners did not reconcile their schedules to those of respondent, although it appears that the difference between respondent's and petitioners' 1981 cash expenditures approximates the $ 1,268.73 reconstruction by respondent of cash expenditures regarding the operation of petitioners' automobiles. (Respondent's $ 9,639 less petitioners' $ 8,483.64 equals $ 1,155.36.) Petitioners' *36 schedules also reflected sources of income which were included in the amounts they reported on their returns thereby either inflating their sources or duplicating the eliminations made by respondent in his expenditures calculation, with some exceptions. Neither party attempted to reconcile the differences between their calculations. Petitioners contend that the following items were nontaxable sources which respondent failed to take into account: 1980
Sale of Automobile, May 1980
$   900.00
Opening cash
1,000.00
Sale of dining room set "sold in 1979-cash
carried into 1980"
4,000.00
Total source items not considered by
respondent
$ 5,900.00
1981
"Sale of Personal Goods"
Blackboard
$  40.00
Upright piano
600.00
Draperies
22.50
2 clocks
100.00
Silver
210.00
Lawn mower
60.00
Dog run
35.00
Typewriter
45.00
3 suits
75.00
Toys
12.00
Table cloth and napkins
79.50
Ruby pin
200.00
Area rug
100.00
Tea service
53.00
Mirror
75.00
$ 1,707.00
Cash from relatives
140.00
Total source items not considered by
respondent
$ 1,847.00
1982
"Sale of Personal Goods"
2 chairs
$ 300.00
Lg. slate pool table
830.00
Used violin and case
250.00
Girl's bedroom set
275.00
Walnut king size bed
480.00
Electric guitar and case
150.00
Large sofa
630.00
Boy's bed, toy box and curtains
120.00
2 custom king spreads
110.00
Child's desk antique
62.50
Clock
482.00
2 art glass bedroom lamps
250.00
Dog house
40.00
2 lawn mowers
90.00
Custom bedroom draperies
95.00
Child's curtains and spread
48.00
8 place setting -- china
89.00
Lg. outdoor storage building
175.00
Toys
26.40
Better clothes
76.00
Diamond ring
465.00
$ 5,043.90
Cash from relatives
160.00
Total source items not considered
by respondent
$ 5,203.90
*37 Petitioners take the position that respondent must show or has the burden of showing that his computation is correct. Normally, respondent's determination is afforded a presumption of correctness and it is the taxpayer or petitioner's burden to overcome the presumption and/or show that respondent erred. Welch v. Helvering,290 U.S. 111 (1933); rule 142(a). Respondent's use of a method of reconstructing a taxpayer's income is not arbitrary and unreasonable so as to shift the burden of going forward with the evidence to respondent if there is a reasonable basis for reconstructing income. Helvering v. Taylor,293 U.S. 507 (1935). If a taxpayer does not, for example, maintain adequate books or records, it may be reasonable for respondent to use reconstruction methods. Harper v. Commissioner,54 T.C. 1121, 1128-1129 (1970). In this case petitioners did not provide respondent's revenue agent with records of their income from Creative Sound. When petitioners did provide billing records to respondent's counsel, the records reflected less than the amounts reflected on petitioners' tax returns and deposits in their bank account. We, *38 accordingly, find that respondent was not unreasonable or arbitrary in resorting to a reconstruction method to determine whether petitioners' gross receipts or income were underreported for the 3 years in issue. We next consider whether respondent used an accepted method of reconstruction of petitioners' income for the taxable years 1980, 1981 and 1982. The cash expenditures method of reconstruction [7] is a variation of the net worth method [8] and is based on the assumption that absent some explanation, excess expenditures over known sources of funds represent unreported taxable income. Taglianetti v. United States,398 F.2d 558, 562-563, (1st Cir. 1968), affd. per curiam on another issue 394 U.S. 316 (1969). "A * * * deficiency determined by use of the cash expenditures method is presumptively correct, and the burden of proof is upon the taxpayer to demonstrate otherwise. " (Case citations omitted.) DeVenney v. Commissioner,85 T.C. 927, 930-931 (1985). *39 Petitioners, in their reply brief and without apparent understanding of the theory of the cash expenditures method, attempted to present their own cash expenditures computation. Petitioners' approach falls short of meeting their burden of showing respondent's determination to be in error or that they had sufficient nontaxable sources of cash to overcome the amount of excess expenditures developed in respondent's computation. Within petitioners' computation, however, we have found some points which require discussion and result in some adjustments to respondent's computations. For 1980, petitioners assert, and we agree, that respondent failed to give credit for the $ 1,000 of cash on hand that Mr. Hefti disclosed to Revenue Agent McGrath. Also for 1980, petitioners have asserted that they sold assets for cash or had cash on hand from a prior year sale of assets which represented a nontaxable source of cash. We are not able to adjust respondent's computation for these items on two grounds: (1) Petitioner have provided no supporting documentation or corroborating evidence of these sales. We have nothing more than petitioners' uncorroborated testimony of items sold which surfaced only *40 after the trial began, although requested by respondent's revenue agent and attorney during the administrative and litigation portions of this matter. [9] (2) Petitioners have not shown that the automobile or dining room set had not been claimed as business assets which had been depreciated and may be subject to recapture provisions. Moreover, petitioners have not shown that these assets were not sold at a profit, which would require their inclusion in petitioners' income and, therefore, not represent nontaxable sources. Because petitioners admitted that these alleged sales proceeds were not included in their gross income and because they have not proven their bases in these assets, we are unable to further reduce respondent's cash expenditures computation. *41 Petitioners, for 1981 and 1982, claimed that they received $ 140 and $ 160, respectively, in cash from relatives for birthdays and similar occasions. We find this to be a fact and, accordingly, respondent's 1981 and 1982 cash expenditure computations should be reduced by these amounts. Petitioners also claim to have sold a relatively large number of "personal" assets during 1981 and 1982, for amounts totaling $ 1,707 and $ 5,043.90, respectively. Here again we are unable to make adjustments to respondent's computations because of the uncorroborated nature of petitioners' contentions and the possibility that these items may have generated income which petitioners admittedly did not report. We find that respondent was justified in using a reconstruction method and that the method used has not been shown to be error, except as redetermined in this opinion. Petitioners' Residence -- Use for Business
Petitioners operate their business enterprise exclusively out of their residence. Petitioners' residence is comprised of two attached buildings. The original or main building was a residence comprised of a basement and three stories with a two-car garage on the first level *42 under which there was no basement area. A second two-story building or addition, which is attached to the main building by a breezeway, was added during the period 1980 through 1981. The addition was designed as a four-car garage on the first level and subdivided rooms on the second level. The parties are in disagreement about the exact square footage of the combined buildings. Petitioners submitted a blueprint which they calculated to reflect 9,142 square feet and respondent contends that his survey, conducted by an Internal Revenue Service engineer, totaled 8,900 square feet. [10] The 242 square-foot difference between the parties is attributable to areas on the third floor of the main building which are somewhat inaccessible due to the slope of the roofline that causes a relatively abrupt reduction in the height of the ceiling. Although we agree with petitioners that this space is available for some purposes, we also, to some extent, agree with respondent that the use is limited because of the declining roofline. Because the areas in dispute would not be usable on an equal basis with other areas of the structure, we find, for purposes of this case, that the actual usable square *43 footage of the residence is 9,021 square feet. [1]1 For the taxable years 1980, 1981 and 1982, petitioners claimed depreciation on the main building based upon an 89-percent business usage. The main building has a 40-year useful life and petitioners' cost basis is $ 121,380.06. [12] Respondent, in the notice of deficiency, without questioning the useful life or cost basis, allowed depreciation on the main building utilizing a business basis of $ 9,640 which amounts to 7.94-percent business usage. Petitioner also claimed depreciation based upon 100-percent business use of the following listed realty: Description
Date Acquired
Cost
Life/Rate
Studio II
06/78
$  1,592.39
15 Yrs.
Third Floor Storage
1978 14,751.46
15 Yrs.
Warehouse (Addition)
1980 33,012.43
15 Yrs.
Misc. [1]3
4/81 2,114.94
9/10%  15 Yr. Real Property
4/81 25,461.62
9/10%  *44 Respondent, in the notice of deficiency, disallowed all depreciation connected with the above-listed realty items and petitioners have presented no specific evidence or reference in their briefs as to most of these specific items. Our analysis of the realty is on a room-by-room basis in accord with the parties' presentations.
Petitioners bear the burden of proving entitlement to deductions which respondent has disallowed. *45 Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Section 167 allows taxpayers to deduct, as depreciation, a reasonable allowance for wear and tear of property used in a trade or business. Where, however, a taxpayer uses a portion of their dwelling or residence for business purposes, special rules and limitations have been established by Congress. Section 280A provides, in pertinent part, as follows: (a) GENERAL RULE. -- Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. (c) Exceptions for Certain Business or Rental Use; Limitation on Deductions for Such Use. -- (1) Certain business use. -- Subsection (a) shall not apply to any item to the extent such idem is allocable to a portion of the dwelling unit which is exclusively used on a regular basis -- (A) [as] the principal place of business for any trade or business of the taxpayer, (B) as a place of business which is used by patients, clients, or customers in meeting or *46 dealing with the taxpayer in the normal course of his trade or business * * *. (2) Certain storage use. -- Subsection (a) shall not apply to any item to the extent such item is allocable to space within the dwelling unit which is used on a regular basis as a storage unit for the inventory of the taxpayer held for use in the taxpayer's trade or business of selling products at retail or wholesale, but only if the dwelling unit is the sole fixed location of such trade or business.
In this statutory framework, respondent questions whether 89 percent of petitioners' residence was "exclusively used on a regular basis." Respondent determined that about 7.94 percent of the main building and no part of the addition were used for business purposes. Respondent argues that petitioners are not entitled to claim any room which is not exclusively and regularly used for business purposes. Petitioners argue that they are entitled to 89 percent of the main residence for business purposes, either because they use it exclusively and regularly for business purposes or that it is used for storage which is an exception to the "exclusively" requirement so as to be allowable as an allocable portion *47 of the particular room. We must, therefore, determine whether petitioners used each of these rooms "exclusively" and on a "regular basis" or whether any portion of a room was used for storage of business inventory. The legislative history underlying the 1976 enactment of section 280A contains the following commentary on the term "exclusive" in S. Rept. 94-938, 4, 148, 1976-3 C.B. (Vol. 3) 49, 186: Exclusive use of a portion of a taxpayer's dwelling unit means that the taxpayer must use a specific part of a dwelling unit solely for the purpose of carrying on his trade or business. The use of a portion of a dwelling unit for both personal purposes and for the carrying on of a trade or business does not meet the exclusive use test. Thus, for example, a taxpayer who uses a den in his dwelling unit to write legal briefs, prepare tax returns, or engage in similar activities as well for personal purposes, will be denied a deduction for the expenses paid or incurred in connection with the use of the residence which are allocable to these activities. * * * Respondent, during 1980 and 1983, issued Proposed Income Tax Regs. section 1.280A-2(g)(1), which remains outstanding, *48 [14] defining the "exclusive use requirement," as follows: (g) Exclusive use requirement -- (1) In general. Paragraph (b), (c), or (d) of this section may apply to the use of a portion of a dwelling unit for a taxable year only if there is no use of that portion of the unit at any time during the taxable year other than for business purposes. For purposes of section 280A(c)(1) and this section, the phrase "a portion of the dwelling unit" refers to a room or other separately identifiable space; it is not necessary that the portion be marked off by a permanent partition. * * * The Senate Report underlying the 1976 enactment of section 280A also comments upon used on a "regular basis" requirement, in S. Rept. 94-938, 4, 148, 1976-3 C.B. (Vol. 3) 49, 186, as follows: In addition to the exclusive use test, the committee's amendment requires that the portion of the residence used for trade or business purposes must be used by the taxpayer on a regular basis in order for the allocable portion of the expenses to be deductible. Expenses attributable to incidental or occasional trade or business use of *49 an exclusive portion of a dwelling unit would not be deductible even if that portion of the dwelling unit is used for no other purpose. Congress has imposed rather stringent conditions upon the use of a dwelling or residence for business purposes. We have considered situations where taxpayers have tried to show that the residence use was for business purposes and/or used by clients. See Frankel v. Commissioner,82 T.C. 318 (1984); see also Green v. Commissioner,78 T.C. 428 (1982), revd. 707 F.2d 404 (9th Cir. 1983). Here, petitioners are not confronted with the question of whether their residence is used for business purposes or whether clients use some of their residence for business purposes. Petitioners' principal and sole place of business is in their home. Petitioner are confronted, however, with the burden of showing exclusive and regular use as required in section 280A and explained in the legislative history. Any personal use of a room or segregated area will preclude its use in computing depreciation or other allocable expenditures, unless some or all of the use of the room was for the storage of inventory. Petitioners *50 have contentiously and doggedly contended that 89 percent of their main residence and 100 percent of their addition were being exclusively and regularly used for business purposes during the taxable years 1980, 1981 and 1982. The correlative of petitioners' position is that they lived in no part of the addition and that they, along with their two children, resided in only 11 percent of their residence. Petitioners would essentially ask us to find that they had no personal use of any part of an approximately 9,000 square foot residence other than two or three bedrooms, a couple of bathrooms and the kitchen. They have gone to great lengths to use nomenclature intended to convince us that a dining room is a "conference room;" and a living room or den is "Room 102" or some type of music room because it has a piano in addition to other normal household furnishings. Petitioners attempted to convince us that they and their children had no social or personal life in any portion of the residence other than a few bedrooms and the kitchen. They have stated that the Christmas tree by the front entry was not for the family, which included young children, but was for clients to enhance the *51 mood of the season for business purposes. Mr. Hefti testified that he did not read stories to his children in the den, living room, etc., but only did so in the children's bedroom. [15] Moreover, he stated that the children were not permitted in any other part of the residence and were limited to watching television in their room, even though petitioners maintain a large screen television in the den. Respondent, through cross examination, third-party testimony and documentary evidence has effectively shown that petitioners' claimed percentage business usage was substantially overstated and we are unable to believe petitioners' testimony regarding their "business" use of the residence. Clients of petitioners entered the residence through a back stair which went directly to Mr. Hefti's office area on the second floor. Some of the first floor rooms (dining, den, living room, etc.) were used for meeting and dealing with clients and also for production of video materials. But the majority of petitioners' identifiable *52 business concerned audio work which was accomplished mainly in the areas solely dedicated to business use. [16] Social acquaintances of petitioners were invited into petitioners' residence and were entertained in areas which petitioners contend were used only for business, i.e., den. Although some of the common areas in the residence had some equipment which may have been used for business purposes, the rooms were not exclusively and regularly so used. Based upon the facts and circumstances contained in this record we must redetermine the exclusive and regular usage of each room for business purposes by petitioners. We have carefully reviewed the transcript, documentary evidence and the parties' *53 briefs and hold the following rooms or portions of rooms [17] to be business areas which meet the requirements of section 280A: Room Number
Percentage Business Use
001
25
002
0
003
0
004
0
005
0
006
100
101
0
102
0
103
0
104
0
105
0
106
0
107
0
108
0
109
0
201
100
202
100
203
100
204
100
205
100
206
100
207
0
208
100
209
100
210
100
211
0
212
0
213
0
214
0
215
100
216
100
217
100
301
0
302
0
303
0
304
0
305
0
306
0
307
0
308
0
Addition-Rooms 101 through 215
0
*54 Respondent also disallowed depreciation claimed by petitioners with regard to personalty and certain items connected with the exterior of the residence. Petitioners contended that the "Conf. Rm. Furniture" shown at a cost of $ 11,156.43 was a business asset and respondent has argued that it is a dining room set. For the same reasons stated above, we find that although the dining room set may have been used for a conference or business purpose on occasion, the asset is primarily personal in nature and was used primarily as part of petitioners' personal furnishings. The determination disallowing the remaining depreciation items set forth in the notice of deficiency must be upheld for lack of substantiation of basis, useful life and business use by petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners deducted 89.6 percent for 1980 and 1981, and 87.6 percent for 1982 of utilities and homeowners insurance based on those claimed percentages of business use of the residence. Of these items respondent allowed only 8 percent in 1980, and 7 percent in 1981 and 1982, based upon respondent's redetermination of business usage. [18] Petitioners *55 are entitled to deduct utilities and homeowners insurance for 1980, 1981 and 1982, based upon the amounts claimed times the percentage business use determined under our room-by-room analysis of their residence. Petitioners claimed deductions for maintenance in the amounts of $ 19,142.37, $ 9,670.62 and $ 4,419.59, for the taxable years 1980, 1981 and 1982, respectively. Respondent disallowed all but $ 326.65 of the amount claimed for 1982. Petitioners offered their ledger sheets which reflected cash and check payments for maintenance. The ledger records are segregated into amounts solely for business maintenance *56 and amounts for overall maintenance of the residence. The overall maintenance, which petitioners have labelled as "partial maintenance," was claimed in proportion to the business usage contended by petitioners. The overall or "partial maintenance" generally pertained to repairs and maintenance to the outside structure of the residence and to the surrounding grounds. The "solely for business" maintenance was for inside repairs to the residence and to petitioners' business equipment and assets. We have reviewed petitioners' ledgers or summaries and find them to be properly prepared so as to reflect actual expenditures for which petitioners have documentation. [19] Although respondent argues that petitioners have not substantiated their maintenance expenditures due to a lack of testimony, we find that petitioners' record summaries are reliable as depicting actual expenditures supported by underlying documentation about which respondent was free to cross examine petitioners. Respondent, after stipulating these records as true and correct copies of petitioners' summaries, engaged in limited cross examination on these records and did not offer contradictory evidence on the maintenance *57 items. Having found that petitioners' maintenance amounts have been substantiated, [20] we must now determine whether any portion is deductible under sections *58 162 and 280A. After complete review of the "solely for business" portion of maintenance segregated by petitioners in each year, we find that the items claimed substantially related to maintenance and repair of the equipment, with only limited references to structural-type repairs or painting. Instances of structural-type repairs were small in amount and generally referenced to the "studio." We, accordingly, find that petitioners are entitled to the following amounts of "solely for business" maintenance: (1) 1980 -- $ 1,458.78; (2) 1981 -- $ 2,334.11; and (3) 1982 -- $ 959.29. Concerning the maintenance to the residence as a whole and to the grounds, respondent argues that petitioners are not entitled to any amount based upon the proposed regulations under section 280A and several cited cases. Respondent's theory for disallowance of these maintenance items (lawn maintenance, landscaping, driveway repair, etc.) is that they are "inherently personal expenses." Respondent's *59 reference to Proposed Income Tax Regs. section 1.280A-2(i)(7), 45 Fed. Reg. 52405 (Aug. 7, 1980), is inapposite. The section referenced contains an example of the operation of Proposed Income Tax Regs. section 1.280A-2(i)(5), 45 Fed. Reg. 52404 (Aug. 7, 1980), which provides for an ordering of types of deductions where the deductions from a particular business activity in the home exceeds the income from that same activity. In that type of circumstance the illustration or example, lawn care, was relegated to the third level or tier of deductions which were not deductible in excess of the income from the home office business activity. The cited sections of the proposed regulation in no way stand for the generalized proposition that lawn care and related maintenance items are inherently personal and/or not deductible. To the contrary, the section would permit lawn care deductions if the amount, considered in a designed relationship to other types of deductions, did not exceed a taxpayer's income from such activity. Petitioners, after considering all deductions claimed, reported some net income from their business in each of the 3 taxable years. *60 The series of cases cited in respondent's brief, all of which concern pre-section 280A years (pre-1976 taxable years), concern the proximate relationship between shrubbery and lawn-type care and the business conducted in a taxpayers' residence. [21]Greenspon v. Commissioner,23 T.C. 138, 151 (1954), affd. 229 F.2d 947 (8th Cir. 1956); Galazin v. Commissioner,T.C. Memo. 1979-206; Butz v. Commissioner,T.C. Memo. 1976-118; Gill v. Commissioner,T.C. Memo. 1975-3. In one of the cited cases we reasoned that the taxpayer was not entitled to deduct lawn care expenses because he did not have clients visiting his office in his home. Here, however, petitioners had clients visiting on a regular basis and the appearance of the residence and the grounds would be of significance to petitioners' business operation. Accordingly, we hold that petitioners are entitled to deduct a proportionate percentage of the "partial" or overall maintenance based upon the percentage business use derived from our room-by-room analysis of petitioners' residence. [22]
*61 Travel and Entertainment Expenses
Petitioners claimed travel and entertainment, and promotion expenses in each of the 3 taxable years. Respondent disallowed the entire amounts claimed and petitioners have conceded reductions to the amounts claimed leaving the following amounts in dispute: Taxable Year
Travel & Entertainment
Promotion
1980
$ 5,167.63
$ 2,092.24
1981
5,700.76
2,213.54
1982
4,490.25
2,687.02
The travel and entertainment consists of trips to Mexico, Orlando, Florida, and Niagara Falls, New York, and entertainment of clients at restaurants. The claimed promotion items consist of the purchase of food from restaurants, grocery stores and variety stores. Included in the food purchases are prepared meals, unprepared foods, candy, beverages, etc. As to the claimed promotion deductions, petitioners' purchases were generally from grocery stores and fast food restaurants. Petitioners kept candy in containers in the business areas [23] and provided working lunches or snacks for clients. Mrs. Hefti generally purchased the items. Mrs. Hefti could not specifically remember how she segregated personal from *62 business purchases of these items, either at the time of purchase or at the time of the storage and use of the items. Although Mrs. Hefti had testified that she was not usually directly involved in business, she may prepare an informal lunch or snack of which she would partake. She intimated that the children only would partake of the "promotion" food when they were directly involved in the business. We find it hard to believe that Mrs. Hefti would make separate lunches or prepare them in separate kitchens on occasions where her children were present. Most of petitioners' clients did not eat many meals at petitioners' residence. We found Mrs. Hefti's testimony on the promotion items to be elusive and unconvincing. [24] Respondent's agent analyzed all checks written to grocery stores and determined the average amount spent per week, the average amount claimed per week for business (promotion) and the average remainder that would result and presumably be personal, as follows: Taxable Year
Total
Business
Personal
1980
$ 37.13
$ 25.72
$ 11.41
1981
48.14
32.65
15.49
1982
48.42
31.42
17.00
Bureau of Labor statistics for the St. *63 Louis, Missouri, area reflect that intermediate to higher budget families of four would spend between $ 112.07 to $ 149.40 weekly, for groceries during the period 1980 to 1981. Although these averages are not conclusive, they do point out the incredible nature of petitioners' position. This is especially so in this case where petitioners maintained only one checking account and both parties have prepared cash expenditures analyses accounting for each check and cash expenditure. These analyses, coupled with the single checking account, confirm the incredible nature of petitioners' contention. *64 Section 162(a) would permit a "deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 274(a) adds extra requirements for taxpayers claiming a section 162(a) deduction. Where it relates to entertainment, unless the taxpayer establishes that the item was directly related to bona fide business discussion associated with the conduct of a taxpayer's business, the expenditure may not be deductible. Section 274(e)(1) provides for an exception to the requirements set forth in section 274(a). Where "food or beverages are furnished to any individual under circumstances which [taking into account the surroundings in which furnished, the taxpayer's business activity relation to the person to whom the food and beverages are furnished] are of a type generally considered to be conducive to business discussion." See sec. 274(e)(1). Petitioners' business circumstances are such that the exception of section 274(e)(1) is applicable. Petitioners, however, must substantiate their claimed deductions pursuant to the requirements of section 274(d) regarding the claimed promotion expenses, which primarily concern *65 providing candy, beverages and light meals to clients during working meetings. See section 1.274-2(f)(1) and (2), Income Tax Regs. In this regard, section 274(d) provides, in part, as follows: (d) * * * No deduction shall be allowed -- (1) under section 162 * * * for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement, (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment * * *, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained * * *.
Petitioners have substantiated and are entitled to a "promotion" deduction of $ 523.06 for 1980, $ 553.85 for 1981 and $ 671.75 for 1982. We now consider the travel and entertainment disallowed deductions. Petitioners' claimed deductions are composed of two general categories: (1) travel away from home, and (2) local entertainment of clients. The travel while away *66 from home and entertainment of clients come under the same statutory provisions as the "promotion" deduction and petitioners must substantiate their claimed deductions pursuant to the requirements of section 274(d). At the time of petitioners' audit, they supplied respondent's agent with the bills, invoices and charge slips for entertainment of clients, which we presume were taken from the "monthly envelopes" maintained by Mrs. Hefti. Respondent's agent reviewed the documents and prepared a summary schedule of the items, all of which were proposed for disallowance. Thereafter, petitioner prepared their own ledger or summary schedule of the entertainment supporting documents and added notations of the "section 274(d) information" on the ledger and supporting documents. [25] Petitioners' entertainment ledger reflects the date, name of the person entertained, amount of meal, whether it was charged or paid for in cash or check and the claimed business purpose was shown by the acronyms "GW/KB" (good will keep business) or "GW/CB" (good will create business). *67 Respondent's agent analyzed the number of times petitioners' entertainment ledgers reflected entertainment for four of petitioners' clients. The results of the analysis reflected a disparity between petitioners' ledger and the four witnesses testimony, as follows: Name of
Times Entertained
Witness/Client
Per Ledger
Per Testimony
Edward Golterman
14
3 [26]  Wallace Mechler
9
3      Arthur Payne
12
often [27]
David Payne
16
1      *68 During the years in question petitioners retained bills, invoices and charge slips which contained insufficient information to meet requirements of sections 162(a) and 274(d). During and after the audit petitioners attempted to reconstruct records which would satisfy the section 274(d) requirements. Names, purposes and other information were added to the underlying documentation and the ledgers or summaries were created. Petitioners, in their zeal to substantiate the amount claimed on their returns, have ineffectively attempted to place a name and purpose with all claimed entertainment events. Section 274 requires documentary evidence which would adequately corroborate a taxpayer's statement. Petitioners' documentary evidence on this item only partly satisfies this requirement. The testimony of some of petitioners' clients corroborate that, to some extent, petitioners' ledgers and underlying documents do correctly reflect business entertainment within the meaning of sections 162 and 274. Based on the testimony, documents and respondent's agent's analysis, which is supported in the record, we find that petitioners have substantiated and are entitled to entertainment deductions *69 of $ 572.94, $ 633.31, and $ 656.73 claimed as part of travel and entertainment for the taxable years 1980, 1981 and 1982, respectively. Petitioner claimed deductions for trips to Mexico and Niagara Falls in 1980 and 1981, and to central Florida in 1982. Petitioners travelled together for the two trips to Mexico and Niagara Falls and they also took their two children on their central Florida trip. Petitioners claimed to have made the trips to record sound effects, unusual music and video materials for their business library. Petitioners stated that they kept a log or diary of their travel, but were not able to produce the contemporaneous logs or diaries. Petitioners attempted to offer handwritten reproductions of the alleged original diaries or logs which they had added to their ledgers during or following the audit process, but these were not received into evidence. [28] Without the contemporaneous diaries or other corroborative evidence, as required by section 274, we are unable to approve any entitlement to petitioners for these travel expenditures. *70 Even if petitioners had produced the documentary evidence they described, the trips, with the exception of central Florida, were not in connection with a particular client or job. We are also at a loss to understand why petitioners would travel to the same locations 2 years in a row, when considering the alleged business purpose for the trips. The trip to central Florida included the young children, which tends to make them more suspect. Additionally, petitioner and their children visited Disney World and numerous other amusement and tourist attractions. Although petitioners connected the Florida trip with a particular client who was interested in some Florida promotions, no direct connection to the myriad tourist attractions was forthcoming. Automobile Deductions
Petitioners, during the years involved, owned three automobiles, a Chrysler New Yorker sedan, a Dodge Aspen station wagon, and a Porsche sports car. Petitioners claimed deductions based upon the premise of 100-percent use of the Chrysler and Dodge for business purposes. Petitioners did not claim the Porsche, which was used solely for personal purposes. Petitioners claimed deductions regarding the Chrysler based *71 upon actual expenditures and utilized an estimated method of mileage times a fixed rate per mile for the Aspen. The amount of petitioners' claimed deductions, respondent's disallowances and petitioners' concessions are as follows: Amt. Claimed
Disallowed by
Conceded by
Year
On Return
Respondent
Petitioner [29]
In Dispute
1980
$ 4,100.94
$ 3,035.38
$ 1,586.00
$ 1,449.38
1981
4,578.02
3,114.89
1,765.85
1,349.04
1982
3,322.44
2,025.64
-0-   2,025.64
Totals
12,001.40
8,175.91
3,351.85
4,824.06
*72 Respndent allowed the actual expenses substantiated by petitioners and denied the remainder of the claimed amounts based upon three theories which have been argued in respondent's brief, as follows: (1) The duplication of expenditures by claiming the invoices and the monthly statements, which petitioners have conceded; (2) the lack of business use of more than one car, which petitioners contest; and (3) case law prohibiting the use of both the actual and estimated methods in the same taxable year. Moreover, respondent intimates that petitioners have claimed all of their actual expenses for both automobiles and have attempted to claim the estimated method for the Dodge, in addition, which would constitute another form of duplication by petitioners. Respondent suggests that it is more than a coincidence that petitioners would have invoices and supporting documents for one "business" automobile and none available for the other, as petitioners have claimed on their ledgers. Mr. Hefti's testimony on the business use of the automobiles was incredible, as illustrated by the following exchange during cross examination: Q Okay. You owned three cars during the years at issue, you owned *73 three cars, correct? A Right. Q A Dodge Aspen which is a station wagon? A Right. Q Chrysler New Yorker? A Yes. Q And a Porsche? A Yes. Q Now, you testified on direct the Chrysler New Yorker was used by you exclusively for business, 100 percent, yes? A Yes. Q You testified that the Dodge Aspen wagon was used by you and your wife for business, correct? A Yes. Q Like your truck. A Truck. Q Now, you told the Judge that you would go places to get away for the weekend and you go to the zoo or the park with your family. Which car would you take? A I would take the Porsche. Q All four of you -- A Well, my boy was very little then. We took the Porsche a lot of places. Q And your wife would -- which car did your wife normally did she drive when she would go out doing her errands during the day? A Porsche. Q She would drive the Porsche? A Yes. Q And if she went somewhere taking your children somewhere, both children would get in the Porsche and she would drive? A It is very easy to put three people in there, especially when you have a four year old. Q If your wife -- THE COURT: Is it going to be your testimony that your *74 wife or you never used the Chrysler or Dodge for any personal purpose such as picking the children up from school or anything like that? THE WITNESS: To the best of my recollection. Here, again, petitioners have stated a position which defies belief. Petitioners would ask us to believe that they went away on weekends with their children in a two-seat sports car or rented a car when they had a station wagon and sedan available -- this we are unable to accept. Petitioners have also shown their zeal in seeking deductions by the double claiming of automobile expenses for 2 years, which they have now conceded. We find that petitioners have failed to carry their burden of proving that they are entitled to automobile expenses in excess of the amounts allowed by respondent in each of the 3 years set forth in the notice of deficiency. Also, as a matter of law, we have decided that taxpayers may not use the estimated method of computing automobile expenses if they operate more than one automobile at a time for business purposes. *75 West v. Commissioner,63 T.C. 252, 254 (1974). In West we approved of respondent's Revenue Procedure 70-25, 1970-2 C.B. 506, which has been superceded by revenue Procedures 80-7, 1980-1 C.B. 590, and 82-61, 1982-2 C.B. 849, all of which provide procedures to claim automobile deductions by means of a specific rate times the number of business miles traveled. All of respondent's procedures are optional and may not be used by taxpayers who have fleet operations or who operate more than one automobile at a time. Accordingly, petitioners are limited to proving their actual automobile expenses. Petitioners are not entitled to use the estimated method for one automobile and actual for the other. Respondent's agent has already reviewed petitioners' underlying documentation and allowed the amounts that were substantiated. Petitioners have not proven that they are entitled to amounts in excess of those allowed by respondent. Rental Property -- Capital vs. Expense -- Depreciation
Petitioners purchased a condominium known as Unit 612, The Knolls Condominium, Laurel Building located at Lake of the Ozarks, Missouri. The purchase price *76 was $ 46,311. Under a December 10, 1982, agreement petitioners placed their condominium in the rental pool. Pursuant to the agreement, petitioners were required to furnish the various rooms of their condominium unit. The items were purchased during December 1982, and petitioners deducted the full cost of some furnishings and other expenses connected with their condominium in the 1982 taxable year. [30] Respondent disallowed the entire claimed expense, labeling it as start-up costs. Respondent allowed 60-month amortization under section 195. [31] Respondent also disallowed a portion of petitioners' claimed depreciation on the condominium property based upon the theory, as contained in a proposed regulation, that petitioners are entitled to only a fractional portion of their first year depreciation where the property is placed in service near the end of the taxable year. There appears to be no dispute about the amounts involved in this issue. *77 Petitioners contend that the full depreciation is permissible no matter when the property is placed in service. Petitioners do not address the "start-up" disallowance in their briefs. Respondent disallowed $ 2,442.32 as start-up expenses. Included within these expenditures are travel in connection with purchase and setting up the unit, insurance, condo fees, etc. These items were paid on or about December 10, 1982. Although certain start-up expenses are not deductible in the year of payment, Richmond Television Corp. v. United States,345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); others may be deductible in a section 212(2) circumstance, Hoopengarner v. Commissioner,80 T.C. 538 (1983), affd. 745 F.2d 66 (9th Cir. 1984), bu the Eighth Circuit to which an appeal in this case would lie, has refused to follow the Hoopengarner holding, Aboussie v. United States,779 F.2d 424, 428 n. 6 (8th Cir. 1985). See also *78 Johnsen v. Commissioner,83 T.C. 103 (1984). Following our holding in Golsen v. Commissioner,54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we will follow the Eighth Circuit's holding and petitioners are not entitled to deduct the amounts respondent has disallowed, as start-up expenditures, for petitioners' 1982 taxable year. As part of a $ 2,023.16 depreciation deduction claimed in connection with the condominium for 1982, respondent disallowed $ 1,516.27 of $ 1,654.11 claimed for the condominium furnishings with a 5-year life. The petitioners claimed a full-year deduction for depreciation at a 15-percent rate and respondent allowed only 1.25 percent based upon 1 month's use in 1982. Respondent relies upon Proposed Income Tax Regs. section 1.168-2(f)(1) and (4), 49 Fed. Reg. 5940 (Feb. 16, 1984), which would limit petitioners' "ACRS" depreciation to the 1.25-percent amount that respondent allowed. Petitioners have made no legal or factual argument upon which we are able to find that respondent's determination is in error and, accordingly, petitioners have failed to carry their burden of proof on this *79 issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Miscellaneous Deductions -- Cost of Sales
Respondent, in the notice of deficiency, disallowed various portions of deductions under the following categories: Cost of Sales, Wages, Office Supplies, Dues and Publications, and Cleaning Supplies. The specific amounts claimed, disallowed and remaining in dispute were reflected in respondent's Appendix A, which has been attached as an appendix to this opinion. The disallowances of wages and cost of sales involved two types of items: (1) supply items, and (2) wages paid to petitioners' children in each taxable year. Concerning the supply items included within Cost of Sales, respondent disallowed specific amounts and allowed specific amounts based upon actual substantiation provided by petitioners at the audit. Petitioners have not provided adequate testimony or other evidence to carry their burden of showing that they are entitled to more than the amounts allowed by respondent for each of the taxable years in issue. Petitioners claimed deductions for wages [32] paid to their children during the taxable years under consideration. Respondent disallowed *80 the entire amount claimed for lack of proof that such payments were ordinary and necessary business expenses. Here again petitioners' explanation is contradictory to their explanation given in an attempt to claim nearly 90 percent of their home for business purposes. Petitioners testified, in support of their claiming almost 90 percent of their home for business, that the children were essentially confined to their rooms and the kitchen. As a reason for the claimed confinement of the children, petitioners cited the delicate and expensive nature of the technical business equipment. Whereas, in connection with their alleged payment of a salary to the children, petitioner would have us believe that the children were operating this same type of equipment. When coupled with the fact that both children were of tender years [33] during the years in question, petitioners' position on this item also defies belief. We hold that petitioners are not entitled to any amount claimed as wages paid to their children during the taxable years 1980, 1981 and 1982. *81 With respect to the remaining categories of expenses claimed, respondent disallowed parts of them for lack of substantiation or business purpose. For example, with respect to Dues and Publications, petitioner had claimed the cost of the daily newspaper and a magazine on dolls as part of this item, which respondent disallowed. Petitioners steadfastly testified that they rarely if ever read the newspaper and that it was purchased for clients to read. Likewise, petitioners stated that the "doll magazine" was not for their daughter, but that "It was a general interest magazine which was put out on the tables." With respect to Office and Cleaning Supplies petitioners did not effectively segregate personal from business. With respect to those items respondent has allowed a portion of the amount claimed based upon actual documentation. Petitioners have not provided credible testimony or other evidence to show, as it is their burden to do, that they are entitled to more than respondent has allowed for each of these items. Welch v. Helvering, supra;Rule 142(a). Therefore, respondent's computations on this issue are upheld. Self-Employment Tax
*82 Sections 401 and 1402 provide for self-employment tax upon self-employment income which may be derived from a trade or business. See also sections 1.1402(a), 1.1402(a)-2 and 1.1402(b)-1, Income Tax Regs. There is no question here about the existence of self-employment income. The question that may [34] confront us is whether Mrs. Hefti, in addition to Mr. Hefti, is responsible for self-employment tax. Respondent, in the notice of deficiency, divided the income from Creative Sound and determined that both petitioners were liable for self-employment tax. Petitioners bear the burden of showing the proper amount of self-employment tax and whether respondent's determination was in error. Welch v. Helvering, supra;Rule 142(a). This issue is essentially one of fact and we have already found that petitioners "operated an audio-visual business known as 'Creative Sound,' as sole proprietors, at their family residence." Although Mr. Hefti possesses most of the technical expertise, Mrs. Hefti is responsible for the financial and recordkeeping aspects of the business. Additionally, she is involved in some of the technical aspects of the business. Based upon petitioners' *83 testimony, the parties' stipulations and other evidence in the record, we find that both petitioners are liable for the tax on self-employment income, the amount to be determined in connection with the parties' Rule 155 computations. Addition to Tax -- Section 6653(a), 6653(a)(1) and (2)
Respondent determined an addition to tax attributable to negligence or intentional disregard of rules and regulations under sections 6653(a) and 6653(a)(1) and (2). Petitioners bear the burden of proving or establishing that the addition to tax is inappropriate and/or that respondent's determination is in error. Rule 142(a). Respondent has argued that petitioner should be liable for the addition to tax because petitioners' books and records were substantially inaccurate. The record in this case amply supports respondent's argument and further reflects that petitioners' records were to some extent incomplete (income records) and contained purely personal expenses *84 which petitioners sought to deduct as business. We, accordingly, hold that petitioners are liable for the additions to tax under section 6653(a) for 1980 and 6653(a)(1) and (2) for the taxable years 1981 and 1982. We find that respondent's determination, as set forth in the notice of deficiency, is not in error, except as noted or stated otherwise in this opinion. To reflect the foregoing, Decision will be entered under Rule 155.
ables:
APPENDIX A
TAXABLE YEAR 1980
Claimed
Adjustment
Amounts
Per Original
in Notice of
Conceded by
Return
Deficiency
Respondent
Gross Receipts
$ 131,208.66
$  4,924.21
[1] $ 1,150.00
BUSINESS EXPENSES:
Cost of Sales
47,158.63
8,893.37
[3] 2,792.66
Wages
9,121.99
3,057.25
-0-  Depreciation
16,262.55
7,662.74
-0-  Utilities & Homeowners
Insurance
3,600.77
3,339.12
-0-  Maintenance
19,142.37
19,142.37
-0-  Automobile
4,100.94
3,035.38
-0-  Promotion
2,216.20
2,216.20
-0-  Travel and Entertainment
5,167.63
5,167.63
-0-  Office Supplies
482.71
174.17
-0-  Dues and Publications
948.51
445.55
-0-  Cleaning Supplies
456.83
456.83
-0-  Investment Credit
1,380.13
557.72
-0-  Self-Employment Taxes
2,737.34
-0-  Negligence Penalty
1,453.86
-0-  *85 Amounts
Amounts
Conceded by
in
Petitioner
Dispute
Gross Receipts
[2] $   276.00
$  3,498.21
BUSINESS EXPENSES:
Cost of Sales
[4] 1,693.22
4,407.49
Wages
-0- 3,057.25
Depreciation
-0- 7,662.74
Utilities & Homeowners
Insurance
-0- 3,339.12
Maintenance
[5] 72.06
19,070.31
Automobile
[6] 1,586.00
1,449.38
Promotion
[7] 123.96
2,092.24
Travel and Entertainment
-0- 5,167.63
Office Supplies
-0- 174.17
Dues and Publications
-0- 445.55
Cleaning Supplies
-0- 456.83
Investment Credit
-0- [8] 822.41
Self-Employment Taxes
-0- 2,737.34
Negligence Penalty
-0- 1,453.86
*86 TAXABLE YEAR 1981
Claimed
Adjustment
Amounts
Per Original
in Notice of
Conceded by
Return
Deficiency
Respondent
Gross Receipts
$ 125,710.89
$  8,277.73
[9] $ 2,850.65
BUSINESS EXPENSES:
Cost of Sales
62,554.15
[10] 12,634.69
[11] 1,012.48
Depreciation
19.410.57
11,541.26
-0-  Utilities & Homeowners
Insurance
3,957.65
3,666.95
-0-  Maintenance
9,670.62
9,670.62
-0-  Automobile
4,578.02
3,114.89
-0-  Promotion
2,331.17
2,331.17
-0-  Travel and Entertainment
5,993.03
5,737.32
-0-  Office Supplies
[17] 938.11
460.38
-0-  Dues and Publications
795.70
262.27
-0-  Investment Credit
-0-   466.72
-0-  Self-Employment Taxes
4,709.45
-0-  Negligence Penalty
[19] 1,325.54
-0-  Amounts
Amounts
Conceded by
in
Petitioner
Dispute
Gross Receipts
-0- $  5,427.08
BUSINESS EXPENSES:
Cost of Sales
[12] $ 4,051.06
7,571.15
Depreciation
-0- 11,541.26
Utilities & Homeowners
Insurance
-0- 3,666.95
Maintenance
[13] 82.08
9,588.54
Automobile
[14] 1,765.85
1,345.04
Promotion
[15] 117.63
2,213.54
Travel and Entertainment
[16] 36.56
5,700.76
Office Supplies
-0- 460.38
Dues and Publications
-0- 262.27
Investment Credit
-0- [18] -0-  Self-Employment Taxes
-0- 4,709.45
Negligence Penalty
-0- [19] 1,325.54
*87 *88 TAXABLE YEAR 1982
Claimed
Adjustment
Amounts
Per Original
in Notice of
Conceded by
Return
Deficiency
Respondent
Gross Receipts
$ 111,784.08
$  9,903.14 [20] $ 1,901.91
BUSINESS EXPENSES:
Cost of Sales
44,163.95
[21] 11,807.99 [22] 1,565.29
Depreciation
20,154.93
13,056.40 -0-  Utilities
3,578.94
3,292.95 -0-  Maintenance
4,419.59
4,092.94 -0-  Homeowners Insurance
704.22
647.95 -0-  Automobile
3,322.44
2,025.64 -0-  Promotion
2,687.02
2,687.02 -0-  Travel and Entertainment
4,490.25
4,123.28 -0-  Office Supplies
[26] 833.45
176.13 -0-  Dues and Publications
1,087.95
550.29 -0-  Cleaning Supplies
361.49
361.49 -0-  Legal Fees
3,085.00
3,000.00 -0-  Condominium:
Rental Expenses
2,442.32
2,442.32 -0-  Rental Depreciation
2,023.16
1,516.27 -0-  Start-Up Amortization
[29] -0-   (40.70)
Medical Expenses
1,078.83 -0-  Investment Credit
[29] -0-   -0-   -0-  Self-Employment Taxes
4,816.17 -0-  Negligence Penalty
[31] 1,134.34 -0-  *89 Amounts
Amounts
Conceded by
in
Petitioner
Dispute
Gross Receipts
-0- $  8,001.23
BUSINESS EXPENSES:
Cost of Sales
[23] $   365.53
9,877.17
Depreciation
-0- 13,056.40
Utilities
-0- 3,392.95
Maintenance
[24] -0- 4,092.94
Homeowners Insurance
-0- 647.95
Automobile
[25] -0- 2,025.64
Promotion
-0- 2,687.02
Travel and Entertainment
-0- 4,123.28
Office Supplies
[27] 19.61
156.52
Dues and Publications
-0- 550.29
Cleaning Supplies
-0- 361.49
Legal Fees
[28] 3,000.00
-0-  Condominium:
Rental Expenses
-0- 2,442.32
Rental Depreciation
-0- 1,516.27
Start-Up Amortization
Medical Expenses
-0- 1,078.83
Investment Credit
-0- [30] -0-  Self-Employment Taxes
-0- 4,816.17
Negligence Penalty
-0- [31] 1,134.34
*90 Footnotes
1. Petitioners were represented by Attorney Jeff A. Schnepper for part of the pretrial, trial and part of the post-trial period. Attorney Schnepper filed petitioners' original brief and due to disagreement between Attorney Schnepper and petitioners, petitioners were granted leave to file their own supplemental briefs. The differences between petitioners and Attorney Schnepper increased and Attorney Schnepper was permitted to withdraw on Aug. 7, 1987, after protracted jousting between petitioners and Attorney Schnepper. ↩
2. For convenience we have combined our findings and opinion and present them in groupings by issue, with the exception of the general or background information which is so labeled. ↩
3. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years before the Court and all rule references are to the Tax Court's Rules of Practice and Procedure. Respondent determined additions to tax under section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1982, the first two years to which section 6653(a)(1)↩ may apply.
*. (Fifty percent of the interest due on $ 26,510.83) ↩
**. (Fifty percent of the interest due on $ 22,686.95) ↩
4. The notice of deficiency contains numerous adjustments. All of the adjustments were the subject of controversy by the parties. Respondent has conceded limited amounts of some adjustments and petitioners were left to their burden of proving their entitlement to the remaining deductions, or the error of respondent's determination that income was underreported. The adjustments, concessions and amounts that remained in dispute for purposes of trial, briefing and opinion have been set out by respondent in "Appendix A," which was attached to his opening brief and is attached to this opinion for convenient reference as Appendix A. Petitioners have not offered evidence or argument with respect to all adjustments and we have considered any such failure to be either for lack of ability to go forward with evidence or for purposes of concession. ↩
5. Petitioners conceded that they failed to include this amount in the checking account and that, accordingly, it was not reported in gross receipts for 1980. ↩
6. These amounts in each of the 3 years involved represent Agent McGrath's review of cancelled checks which were cashed or converted to cash or where the check was written for more than the purchase and cash was returned to petitioners.↩
7. This method has also been called "the source and application of funds method." ↩
8. The net worth method was sanctioned by the Supreme Court in Holland v. United States,348 U.S. 121, 135-137↩ (1954). 9. There is also contradiction in petitioners' assertions because they have otherwise argued in this case that they have relatively little personal assets and devote 100 percent of their time and effort to their business. In their effort to substantiate an apportionment of nearly 90 percent of their residence for business purposes they classify, what in most homes would be a dining room, as a conference room. In furtherance of their position they point out that the table and chairs in the "conference room" are conference table and chairs. Their blueprint and testimony concerning their residence references no dining room. However, when it is expedient to have a nontaxable source of cash, they suddenly reflect the $ 4,000 sale of a "personal" dining room set. We find this type of inconsistency to strongly suggest fabrication and to limit petitioners' testimony to a low level of credibility to be afforded little weight and probative value as evidence. ↩
10. Prior to trial respondent moved for and was granted an order requiring petitioners to permit respondent access to their residence for purposes of observation and measurement. Exs. AM, CN, CO; Tr. 562-569 [1]↩1 For purposes of the parties' computation of the percentage of expenditures or depreciation deductible, the 121 square-foot reduction from petitioners' total should be apportioned between rooms 301 and 308 based upon a ratio determined by comparing the size of these two rooms as shown on petitioners' Exhibit 35. 12. The $ 121,380.06 basis is derived by dividing the returned $ 108,028.25 basis by the 89-percent business allocation claimed by petitioners. [1]3 We have classified this as real property because it was associated with the "15 Yr. Real Property" and had been assigned the same useful life by petitioners. There is insufficient information in the record to determine the actual nature of this property. Although we are not certain that this entry represents real property, our inability to discern whether this is realty or personalty has no effect upon and would not change the outcome of this case.↩
14. Final regulations for sec. 280A↩ have not yet been published. 15. Petitioners contend, with approximately 9,000 square feet of space, that they kept both children in one small upper floor bedroom during the years in question. ↩
16. Respondent analyzed the billing records that petitioners made available and determined the following percentages of different types of work were performed, as follows: ↩
Type of Work Performed
1980
1981
1982
Audio Production
63.5%
50.5%
48.3%
Audio Duplication
15.0 15.1 18.0 Video Production
1.8 2.8 4.8 Video Duplication
1.7 1.3 0.4 Other
18.0 30.3 28.5 Totals
100.0%
100.0%
100.0%
17. In instances where petitioners store business inventory they would be entitled to that portion of a room as part of the percentage business usage to compute depreciation and related expenses. Petitioners' business is service oriented and their product is mostly intangible -- audio and video productions. In this setting, the audio and visual tapes and mediums are considered inventory, but the machinery, hardware, equipment and other assets utilized in creating the final product are not inventory for resale. We do not have to consider whether petitioners' supplies for business operation fall within this categorization because petitioners did not testify or contend that this type of asset was stored. Moreover, the cleaning supplies and other materials used in maintaining the home may be partially deductible as part of maintenance expense and, by definition, are not part of petitioners' business inventory. ↩
18. On brief respondent noted that the notice of deficiency was "erroneous" to the extent that it allowed 8 percent in 1981 and 7 percent in 1981 and 1982 because petitioners were entitled to only 5 percent in all 3 years. Respondent's 5-percent figure is based upon a business usage of Rooms 215, 216 and 217 only, which equalled 461 square feet divided by respondent's calculation of 8,900 total square feet reaching a 5-percent result. Respondent does not seek an increased deficiency based upon his position, but makes this analysis a part of his argument on brief. ↩
19. During the taxable years 1980, 1981 and 1982, petitioners did not maintain actual ledgers or formal books. Instead they maintained envelopes, on a monthly basis, in which they placed invoices, bills and other evidence of expenditures. The contents of each monthly envelope was then occasionally sorted into specific categories, such as "Maintenance" and attached together. Petitioners brought their underlying records to the courtroom and they were available during the trial. Respondent's agent, during the examination, reviewed the underlying documentation and prepared schedules reflecting the allowed and disallowed items. Respondent's agent's schedules have been made a part of this record, along with petitioners' summaries and they are comparable. It appears that respondent's agent saw the same underlying documentation and that there is relatively little dispute in this case concerning whether amounts were in fact expended. The question we are generally confronted with is whether the expenditure is deductible. ↩
20. The summation on petitioners' ledgers concede that they overclaimed $ 72.06 in partial maintenance in 1980, $ 82.08 in "solely for business" maintenance in 1981, and $ 30.28 in partial maintenance in 1982. ↩
21. One case involved a farmhouse owned by a corporation. ↩
22. The amounts claimed, as modified for petitioners' concession of overclaimed amounts in 1980 and 1982, are: 1980 -- $ 17,166.23, 1981 -- $ 7,254.43, and 1982 -- $ 3,919.84. Because these amounts relate to partial maintenance, it is possible, although not readily discernible from the record, that these totals for each year should be divided by the business percentage used by petitioners for that year and then multiplied by the amount of business use of the residence based upon our room-by-room analysis. We leave the parties to their Rule 155 computations on this point. ↩
23. Petitioners' testimony regarding business areas must be considered in light of their view that 89 percent of their residence was solely for business. ↩
24. The 1980 promotion ledger shows no personal segregation of purchases, whereas the 1981 ledger does show some amount of segregation. On direct testimony Mrs. Hefti stated that she would purchase personal and business items at the same time and then line out or circle the personal items to segregate them for deduction purposes. Respondent offered several grocery store tapes, from the period in question, which reflected no segregation and some which had circled items, but for which the entire amount was claimed on petitioners' ledger-summary and income tax return. When confronted with these tapes, Mrs. Hefti attempted to change her testimony to the effect that she checked out two separate times. She indicated that on occasion $ 30 cash would be returned from her business purchase and that she would separately shop for personal items from the $ 30 cash. She also indicated that she might buy vegetables for clients at a regular supermarket and purchase other vegetables for her family or clients at a specialty market. In an attempt to support petitioners' position, Mrs. Hefti's testimony on these items became convoluted and contrived. Mrs. Hefti would have us believe that although these items were regularly purchased and available in the residence, that she, Mr. Hefti and the two young children did not partake of candy, soda, pretzels, etc., unless they were conducting business. Furthermore, she would have us believe that they bought separate stores of these items for personal occcasions. It also appears from Mrs. Hefti's testimony that the family lived on occasional $ 30 purchases, whereas petitioners were spending as much as $ 50 or more weekly on occasional snacks and meals for clients. ↩
25. Our analysis of the record in this case reflects that all of petitioners' ledgers were prepared at or after the time of their audit by respondent. It is likely, based upon respondent's agent's testimony and other indications, that notations on summaries and supporting documentation were added by petitioners whenever it suited their purpose. Respondent has argued that petitioners did this to "doctor" the records or as a subterfuge. We find that petitioners did not do this to deceive respondent or the Court, but did it because of their lack of knowledge of the legal infirmity of such extraneous and uncontemporaneous commentary. Petitioners, in spite of their attorney's counseling, the Court's explanation and respondent's counsel's insistence, have considered notes that they put on documents or their ledgers (which are merely considered summaries of documents) to be evidence in support of their case and a substitute for their testimony. Petitioners' erroneous understanding of their written comments has been the cause for many inflammatory and baseless accusations by petitioners against respondent's counsel and their own counsel. ↩
26. Mr. Golterman testified that petitioners' took him out for meals or entertainment a "few" times. Petitioners argue that the term "few" may be interpreted differently, but we have accepted respondent's more reasonable position that it means two or three in normal parlance. ↩
27. Mr. Payne was a personal friend of Mr. Hefti and had no direct business connection with petitioners. He could only relate one instance where he may have referred another friend to petitioners regarding the installation of a satellite dish. We are unsure about petitioners' business activity including the sale of hardware, and the testimony on this point was, at best, unclear. Mr. Payne was often taken to lunch by Mr. Hefti.↩
28. Mr. Hefti first testified that the handwritten notations on the ledger sheets were copied from the original logs or diaries of trips. When asked to produce the original logs or diaries, petitioners were unable to do so. Then Mr. Hefti changed his testimony and stated that the written notations on the ledgers were the originals. Although Mr. Hefti may have used a play on words in the sense that the notations on the ledgers were the same as the originals, his approach was deceptive and evasive, because petitioners did not produce the "originals" and clearly did not have the ledger sheets at the time of the trips. ↩
29. Petitioners, on some of the ledgers concerning their claimed automobile expense deductions, conceded that they had duplicated some deductions by claiming the individual invoices and the total of the monthly statements. Although there is no clear indication in the record, it would appear that petitioners did not double deduct the invoices and monthly statements for the 1982 year. We make this assumption because petitioners did not concede any amount for 1982, as they had for the prior 2 years, and the amount claimed for the year is about 25 percent less than prior years. The 25-percent figure is approximately correct, in theory, because actual expenses were being claimed for only one of the two automobiles involved. ↩
30. Petitioners, for 1982, claimed a $ 4,465.48 loss associated with the condominium, comprised of the following amounts: Travel and entertainment expenses - $ 2,442.32; insurance - $ 127.00; supplies - $ 1,870.02; freight - $ 28.61; condo fees - $ 343.02; and depreciation - $ 2,023.16. ↩
31. Respondent allowed the 60-month amortization under sec. 195 even though petitioners had not made the required election. Obviously, petitioners would not have made such an election where they deducted the full amount as an expense in the year of expenditure. In any event, respondent's allowance is in the nominal amount of $ 40.70. ↩
32. The amounts of the claimed children's wages in dispute are $ 3,057.25 -- 1980, $ 3,800.00 -- 1981, and $ 6,400.00 -- 1982. ↩
33. As of 1980, both of petitioners' children were under 10 years of age and the youngest was 4 years old. ↩
34. Although respondent anticipated that petitioners might contest respondent's determination that both petitioners are responsible for self-employment tax, petitioners' briefs and supplemental filings are silent on this point. ↩
3. Ex. BR ↩
2. Tr. 565 ↩
4. The petitioners' 1980 cost of goods sold schedule. Ex. 5, reports $ 45,465.41 expenditures, $ 45,846.74 claimed on their 1980 tax return, and $ 381.33 concession. The petioners' 1980 cost of goods sold schedule erroneously reported the cost of goods sold claimed on their 1980 tax return. The petitioners' 1980 cost of goods sold deduction was $ 47,158.63, 1980 tax return, Schedule C, line 2, Ex. 1-A. The respondent treats the difference between the claimed cost of goods sold by petitioners on Ex. 5 and their tax deduction, $ 1,693.22 ($ 47,158.63 minus $ 45,465.41), as a concession. ↩
5. Ex. 14 ↩
6. The petitioners now claim the following 1980 aubomobile expenses: Chrysler New Yorker
(Ex. 8) --
$   984.06
(claimed on the actual
expense method)
Dodge Aspen (Ex. 9) --
240.46
(claimed on the actual
expense method)
1,290.42
(claimed 14,338 miles
at 9" a mile)
Total
$ 2,514.94
On their 1980 tax return the petitioners claimed $ 4,100.94 automobile deductions; thus, the petitioners concede $ 1,586.00. ↩
7. Ex. 12 ↩
8. Basis of assets on which investment tax credit was claimed $ 13,801.33. ↩
9. Ex. CN↩
10. $ 8,834.69 - various expenditures 3,800.00 - alleged wages paid to petitioners' children
$ 12,634.69; See,↩ Stip., para 6(a). 11. Ex. BS ↩
17. On the petitioners' 1981 tax return, Schedule C, line 21, the petitioners deducted $ 938.11 office supplies and postage. Only the office supplies expenditures are in issue. ↩
19. Plus penalty on the entire deficiency under section 6653(a)(2)↩. 12. The petitioners' 1981 cost of goods sold schedule, Ex. 6, reports $ 49,569.09 expenditures, $ 53,515.78 claimed on their 1981 tax return, and $ 3,946.69 concession. The petitioners' 1981 cost of goods sold schedule erroneously reported the cost of goods sold claimed on their 1981 tax return. The petitioners' 1981 cost of goods sold deduction was $ 62,554.15, 1981 tax return, Schedule C, line 2. The petitioners have informally advised respondent that the difference between the cost of goods sold expenditures per return, as reported on Ex. 6, and their actual cost of goods sold deduction represents subcontract payments not included on the petitioners' cost of goods sold schedule, Ex. 6. The petitioners' 1981 claimed subcontract expenditures includible in their cost of goods sold account are depicted on the first page of the respondent's analysis of their 1981 cost of goods sold account, Exs. F and BS, and total $ 8,934.00. The petitioners claimed 1981 cost of goods sold as respondent understands their claim is: $ 49,569.09
--
Exhibit 6
8,934.00
--
Subcontract
$ 58,503.09
The respondent disallowed the following claimed 1981 subcontract expenditures: $ 1,500.00
--
Charlotte Hefti
1,800.00
--
Charlotte Hefti
500.00
--
Charles Hefti, Jr.
1,108.97
--
undescribed, but a double deduction
$ 4,908.97
Due to an error the $ 1,108.97 double deduction was not denoted with a red ink "X" on Exs. F and BS. On their 1981 tax return, Schedule C, line 2, the petitioners claimed a $ 62,554.15 cost of goods sold deduction. The respondent treats the difference between $ 62,554.15 cost of goods sold claimed on the petitioners' 1981 tax return and their now claimed $ 58,503.09 deduction as a concession, $ 4,051.06. ↩
13. Ex. 17 ↩
14. The petitioners now claim the following 1981 aubomobile expenses: Chrysler New Yorker
(Ex. 10) --
$ 925.37
(claimed on the actual
expense method)
Dodge Aspen (Ex. 11) --
434.47
(claimed on the actual
expense method)
500.00
(claimed estimate of
cash expenses)
948.33
(claimed 10,537 miles
at 9 a mile)
Total
$ 2,808.17
On their 1981 tax return the petitioners claimed $ 4,578.02 automobile deductions; thus, the petitioners concede $ 1,769.85. ↩
15. Ex. 13 ↩
16. Ex. 28 ↩
18. Basis of assets on which investment tax credit was claimed $ 4,667.22. ↩
20. Ex. CN↩
21. $ 5,407.99 - various expenditures 6,400.00 - alleged wages paid to petitioners' children
$ 11,807.99; See,↩ Stip. para. 7(a). 22. Ex. BT ↩
26. On the petitioners' 1982 tax return, Schedule C, line 20, the petitioners deducted $ 833.45 office supplies and postage. Only the office supplies expenditures are in issue. ↩
29. No income tax liability reported by petitioners on their 1982 federal income tax return. ↩
31. Plus penalty on the entire deficiency under section 6653(a)(2)↩. 23. ($ 150.43 -- Ex. 7; $ 215.10 -- Tr. 333-335) The petitioners' 1982 cost of goods sold schedule, Ex. 7, reports $ 34,630.47 expenditures, $ 34,905.87 claimed on their 1982 tax return, and $ 275.40 concession. The petitioners' 1982 cost of goods sold schedule erroneously reported the cost of goods sold claimed on their 1982 tax return. The petitioners' 1982 cost of goods sold deduction was $ 44,163.95, 1982 tax return, Schedule C, line 2. The petitioners have informally advised respondent that the difference between the cost of goods sold expenditures per return as reported on Ex. 7 and their actual cost of goods sold deduction represents subcontract payments not included on the petitioners' cost of goods sold schedule, Ex. 7. The petitioners' claimed 1982 subcontract expenditures includible in their cost of goods sold account are depicted on the last page of the respondent's analysis of their 1982 cost of goods sold account, Exs. G and BT, and total $ 9,383.05. The petitioners' claimed 1982 cost of goods sold as respondent understands their claim is: $ 34,630.47
--
Ex. 7
9,383.05
--
Subcontract
$ 44,013.52
The respondent disallowed the following claimed 1982 subcontract expenditures: $ 3,200.00
--
Charles Hefti, Jr.
3,200.00
--
Charlotte Hefti
$ 6,400.00
On their 1982 tax return, Schedule C, line 2, the petitioners claimed a $ 44,163.95 cost of goods sold deduction. Thus the petitioners concede $ 150.43 in Ex. 7 ($ 44,163.95 minus $ 44,013.52). The petitioners also conceded $ 215.10 at trial -- Tr. 333-335. Total concessions by petitioners -- $ 365.53. ↩
24. Although petitioners state that they concede $ 30.28 in their 1982 partial maintenance account, Exhibit 18, a thorough review of the petitioners' 1982 maintenance ledgers, Exs. 18 and 19, leads respondent to believe that the petitioners intend no concession here. The claimed maintenance expenditures in Exs. 18 and 19 exceed the maintenance expenditures claimed by the petitioners on their 1982 tax return. The amount in dispute does not reflect any additional expenditures claimed by the petitioners since the petitioners have made no such claim in their pleadings. ↩
25. At this time the respondent offers no opinion as to any concessions by the petitioners of their 1982 automobile account. On Ex. 39 the petitioners claim the following types of expenditures: ↩
Chrysler New Yorker --
Actual expenses
Dodge Aspen --
Actual expenses
Estimate of cash expenditures
Standard mileage rate
12,848 miles at 9" a mile
27. Ex. 24 ↩
28. Tr. 136 ↩
30. Basis of assets on which investment tax credit was claimed $ 18,250.64. ↩